582 P.2d 1100

**John W. NELSON, Plaintiff-Respondent, Cross-Appellant,**

v.

**Dale D. ARMSTRONG, d/b/a Dale's Equipment Co., Defendant, Third-Party Plaintiff, Appellant and Cross-Respondent,**

v.

**MASSEY–FERGUSON CREDIT CORP., INC., a Foreign Corp., Third-Party Defendant-Respondent.**

No. 12235.

Supreme Court of Idaho.

Aug. 3, 1978.

---

James F. Judd, of Judd & Judd, Post Falls, for appellant.

David A. Frazier, Thomas A. Mitchell, Coeur d'Alene, for respondents.

BAKES, Justice.

This case involves a dispute between John W. Nelson, a farmer, and Dale D. Armstrong, a dealer in farm equipment. The trial court held that Armstrong fraudulently induced Nelson to purchase a tractor and that Nelson suffered damages of $2,820. The court professed to deny Armstrong's counterclaim for the balance due on the price of the tractor and other equipment sold to Nelson, but effectively granted part of the relief which Armstrong sought by way of offset against Nelson's compensato-

ry and punitive damages for the fraud. We affirm the finding of fraud but reverse the finding of Nelson's damages and the denial of Armstrong's counterclaim. The case is remanded for further proceedings.

## I

In the summer of 1969 Nelson and Armstrong entered into an agreement under which Nelson was to purchase certain farm equipment from Armstrong, including a tractor. A written contract, consisting of a "Retail Purchase Order" and a "Retail Instalment Contract and Security Agreement," was prepared and executed. The contract stated that Nelson was making a cash down payment on the equipment of $1,102. However, the evidence suggests that neither party contemplated that the down payment would be made. The trial court found that Armstrong had juggled the figures to show a greater down payment in order to make the contract more acceptable to a financing institution. Armstrong admitted as much. Nelson did not concede his involvement in the scheme to mislead a financial institution, but he admitted that when he signed the contract he was aware that it called for a down payment of $1,102 and that he made no such payment.

Nelson took possession of the equipment, and a lending institution, Massey-Ferguson Credit Corporation (hereinafter MFCC) purchased the installment contract from Armstrong, retaining the right to reassign the contract to Armstrong if Nelson should default. After making his first two payments, Nelson refused further performance of his installment obligations. He maintained that Armstrong had misled him concerning the year in which the tractor was manufactured. Acting as MFCC's agent, Armstrong repossessed the equipment. MFCC thereafter reassigned the installment contract to Armstrong. Armstrong then sold the repossessed equipment pursuant to a stipulation with Nelson entered into some four and a half months after Armstrong took possession of the equipment.

Nelson sued Armstrong, seeking damages for fraudulent misrepresentation, and Armstrong counterclaimed for the balance due on the installment contract. The trial court found that Armstrong had fraudulently misrepresented the tractor as a new 1969 tractor when in fact it was a new 1966 tractor. Noting that Nelson elected to affirm the contract rather than seeking rescission, the court found that the sales price of the tractor was $7,820 (the figure shown on the written contract), that the actual value of the tractor was $5,000, and that Nelson had been damaged in the amount of $2,820. Apparently turning to the computation of Armstrong's counterclaim for damages, the court substituted the $5,000 figure for the $7,820 figure contained in the contract and then computed the balance due from Nelson under the contract. Taking into account the down payment shown in the contract—even though Nelson had not actually paid the $1,102 cash component—Nelson's two installment payments, the proceeds of Armstrong's resale of the equipment, and the accrual of interest, the court found that Nelson still owed Armstrong $184.80. However, the court refused to grant a deficiency judgment to Armstrong in this amount on two grounds. First, it reasoned that the contract was unenforceable in Armstrong's favor as a matter of public policy because he had falsified the figures in the contract in order to induce MFCC to purchase the contract. Second, the court concluded that under I.C. § 28-9-505 Armstrong's delay in pursuing resale of the repossessed equipment barred his recovery of a deficiency judgment. Notwithstanding these conclusions, the court offset the $184.80 due from Nelson on the contract against $1,000 in punitive damages awarded to Nelson on account of Armstrong's fraudulent misrepresentation of the year in which the tractor was made and entered judgment in favor of Nelson for the difference of $815.20.

Both Nelson and Armstrong have appealed. In Part II of this opinion we will consider whether recognizing the claims of one or both of the parties is contrary to

public policy. In Part III we will address Armstrong's contentions that the trial court erred in finding that Armstrong was guilty of fraud by misrepresenting the year in which the tractor was manufactured and in finding the purchase price and actual value of the tractor Nelson received. Finally, in Part IV, we will discuss the impact of Idaho's version of the Uniform Commercial Code upon Armstrong's claim for a deficiency judgment, as well as questions related to the computation of Armstrong's deficiency judgment and Nelson's damages for Armstrong's fraud.

## II

The threshold question in this case is whether one or both parties should be denied relief because the contract upon which they found their respective claims is against public policy. The trial court purported to refuse Armstrong recovery of the balance due him on the contract based upon the finding that he deliberately falsified the figures in order to make the installment contract "more attractive for purchase by some financial institution." On appeal, Armstrong contends first that the contract is enforceable and second that if it is not, both parties should have been left as the court found them since they were equally culpable. While we certainly do not condone misrepresenting financial arrangements in order to induce a third party to extend credit, we think it inappropriate to deny relief to the parties in this case.

The claims presented here, in and of themselves, are not contrary to public policy. Nelson seeks damages attributable to Armstrong's misrepresentation of the year of manufacture of the tractor Nelson agreed to buy, and Armstrong asks for the balance due on the purchase price. These asserted rights have no necessary connection with the falsification of the contract regarding Nelson's down payment and other related matters in order to make the contract more attractive to a lending institution. This dispute could have arisen just as easily had the installment contract faithfully depicted the figures involved in the sales transaction. Where a transaction is composed of both benign and offensive components and the different portions are severable, the unobjectionable parts are generally enforceable. *See Hill v. Schultz,* 71 Idaho 145, 227 P.2d 586 (1951).

Though the rule permitting enforcement of inoffensive parts of an agreement is not invariably applicable, *see* Restatement (Second) of Contracts §§ 325, 326 (Tent. Draft No. 12, 1977), it is well suited to this case. In our view, the threat of civil actions by injured lenders and of criminal prosecutions under I.C. § 18–3101 should adequately discourage the practice of falsifying credit instruments. There is thus no need to deter such misconduct by denying relief with respect to claims that are coincidentally related but inherently unobjectionable. Nor is the severity of the misconduct involved so great as to taint the rest of the transaction. When the tendency of the misleading figures to offend public policy is evaluated, *see Smith v. Idaho Hosp. Serv., Inc.,* 89 Idaho 499, 406 P.2d 696 (1965); *Stearns v. Williams,* 72 Idaho 276, 240 P.2d 833 (1952), it is apparent that the likelihood that MFCC would be harmed by an improvident extension of credit to Nelson was substantially reduced by MFCC's retention of a right to reassign the installment contract to Armstrong if Nelson defaulted. MFCC's successful exercise of its right to reassign the contract bears out the fact that its exposure to loss was limited at the outset. Under the circumstances we are dissuaded from viewing Armstrong and Nelson as villainous rogues and their respective claims as matters of "justice between thieves," with which this court should have nothing to do. *But cf. Everet v. Williams, noted in* W. Lindley, A Treatise on the Law of Partnership 124 n. (a) (9th ed. 1924), W. Prosser, Handbook of the Law of Torts 305–06 n. 40 (4th ed. 1971) (suit of one highwayman against another for accounting of their plunder dismissed and both parties subsequently hanged). We therefore conclude that public policy does not foreclose these litigants from invoking judicial process to settle their differences in this case.

## III

■ Armstrong contends that the trial court erred in finding that he misled Nelson and in arriving at Nelson's damages for the fraudulent misrepresentation which the court attributed to Armstrong. We shall address these contentions in turn.

A. The court below found that Armstrong fraudulently induced Nelson to purchase the tractor by representing to him that it was manufactured in 1969, when it fact it was made in 1966. Armstrong claims that the finding of misrepresentation was not supported by clear, substantial and satisfactory evidence and must be reversed. We have reviewed the record and disagree with this contention.

The relevant factual issue was what Armstrong said to Nelson. Nelson testified that Armstrong told him that the tractor was "a new '69 model." Armstrong admitted that he described the tractor as new but denied that he said anything about its year of manufacture. Although there was testimony that tractors are generally sold as "new" or "used," regardless of when they are made, and although the written contract of sale merely described the tractor as "new," the direct evidence on the question of Armstrong's representation amounted to his word against Nelson's.

Nelson's testimony is sufficient to support the trial court's finding. If credible, the testimony establishes that Armstrong represented the tractor as a 1969 model. The trial court evidently accepted Nelson's testimony, and it is not our place to consider whether Armstrong's version of what was said was more believable. "[T]he determination of the credibility of witnesses and the weight to be given their testimony are exclusively within the province of the trier of facts." *Comish v. Smith,* 97 Idaho 89, 91, 540 P.2d 274, 276 (1975); *see* I.R.C.P. 52(a). "[W]hether . . . fraud has been proven by clear and convincing evidence is solely the determination of the trier of fact. On appeal that determination will not be reversed where supported by competent, substantial, though conflicting, evidence." *Shrives v. Talbot,* 91 Idaho 338, 343-44, 421 P.2d 133, 138-39 (1966). *But Cf. Ed Sparks & Sons v. Joe Campbell Constr. Co.,* 99 Idaho 139, 578 P.2d 681 (1978) (reversing reformation of contract because mutual mistake not proved by clear and satisfactory evidence). Accordingly, the trial court's finding that Armstrong misrepresented the year in which the tractor was manufactured must be upheld.

■ B. Armstrong also argues that the trial court erred in determining Nelson's damages. Specifically, he asserts that the court erred in finding that the purchase price of the tractor Nelson received was $7,820 and that its actual value was $5,000, the difference between these figures being the measure of Nelson's damages.[1] We agree that the court's findings cannot be upheld.

The court's finding that the sales price of the tractor was $7,820 corresponds to the "cash price" for the tractor listed in the written contract. Armstrong maintains, however, that the figure contained in the contract was inflated and that Nelson was actually paying much less for the tractor. The trial court itself specifically found that the written contract falsely showed Nelson making a cash down payment of $1,102 that he did not in fact make. A logical inference from the finding that Nelson made no cash down payment is that Nelson was paying less for the equipment he purchased from Armstrong than the written contract

---

1. This is the so called "out of pocket" measure of damages which this Court has traditionally adopted in fraud actions. *See, e. g., Shrives v. Talbot,* 91 Idaho 338, 421 P.2d 133 (1966); *Koeler v. Stenerson,* 74 Idaho 281, 260 P.2d 1101 (1953); *Smith v. Neeley,* 39 Idaho 812, 231 P. 105 (1924). However, under some circumstances, the Court has applied the "benefit of the bargain" test, measuring damages by the difference between the value of the thing actually received and and the value it would have had if it were as it was fraudulently represented to be. *See Layh v. Jonas,* 96 Idaho 688, 535 P.2d 661 (1975); *Weitzel v. Jukich,* 73 Idaho 301, 251 P.2d 542 (1952) (Porter, J.). Neither party has challenged the trial court's apparent application of the out of pocket measure, and we therefore have no occasion to consider its propriety.

indicated that he was. Thus, there is an apparent inconsistency between the court's finding that the sales price of the contractor was the $7,820 figure contained in the contract and its finding that the contract falsely recited a cash down payment of $1,102. While the findings might be reconciled if it were established that Nelson paid the $1,102 at some other time or that the price reduction came on some item other than the tractor, there is nothing in the record to support such an explanation. Further findings are needed concerning the price Nelson paid for the tractor. *Cf. In re Estate of Stibor*, 96 Idaho 162, 525 P.2d 357 (1974) (trial court's failure to state findings prevented review of sufficiency of evidence to sustain decision).

The trial court found that the actual value of the tractor at the time Nelson received it was $5,000. Armstrong asserts that this finding is totally unsupported by the evidence, and we agree. The only evidence of the tractor's value at the time of purchase was Nelson's testimony that it was then worth $4,800. However, Nelson revealed on cross examination that his opinion concerning the tractor's value was based upon a figure taken from a booklet containing average resale prices for *used equipment.* The trial court explicitly found that the tractor Nelson received "was in fact a *new* tractor in the sense that it had never been operated or worked." (Emphasis added.) Uncontroverted expert testimony indicated that tractors were ordinarily sold merely as "new" or "used," without regard to the year of manufacture. Thus, the average resale price in 1969 of a *used* tractor manufactured in 1966 simply was not relevant to the value of a new 1966 tractor sold in 1969. *Cf. Stroman v. Lynch*, 205 P.2d 409 (Cal.Dist.Ct.App.1949) (cost of new property no measure for value of used). The trial court could not properly correct for the lack of evidence on the value of a new 1966 tractor by boosting the figure given for a used 1966 tractor by $200. In the absence of evidence concerning the relation of used tractor prices to new tractor prices, such an adjustment amounts to speculation.[2] Inasmuch as there was no substantial evidence to support the court's finding that the tractor was worth $5,000 at the time of Nelson's purchase, the finding must be set aside. *See Wood v. Sadler*, 93 Idaho 552, 468 P.2d 42 (1970). On remand, the trial court should take evidence on the actual value at the time of purchase of the new tractor Nelson received.

## IV

Armstrong's claim for the balance due on the installment contract is the locus of several issues raised on appeal. To state these issues comprehensibly, it will be necessary first to review in detail the decisional path followed by the court below.

After the trial court found that Armstrong had fraudulently induced Nelson to purchase the tractor, the court engaged in a series of calculations that, in effect, offset Nelson's compensatory damages for the fraud against the amount he owed Armstrong under the installment contract. The court first computed the amount originally due to Armstrong under the contract by substituting for the price of the tractor shown on the document ($7,820) the amount that the court found to be the actual value of the tractor at the time of Nelson's purchase ($5,000). Then the court credited Nelson with the down payment shown in the contract (the $1,102 cash component of which the court itself had found that Nelson had not paid), with two installment payments, and with the proceeds from Armstrong's resale of the repossessed equipment. With interest figured in, Nelson ended up owing Armstrong $184.80.

---

2. The arbitrary nature of such guesswork is clear in this case. The same 1966 tractor that the court found to be worth $5,000 in a new condition in 1969, was resold for $5,050 as used equipment two years later. (The parties apparently stipulated concerning the purposes for which the facts of the resale could be used. However, the stipulation is not part of the record before us, and we therefore are not constrained by it.) Armstrong himself had paid the manufacturer nearly $5,300 for the tractor in 1967 when it was delivered to him by the manufacturer. The court's finding of the tractor's new value in 1969 cannot be reconciled with the evidence.

The court purported to deny Armstrong a deficiency judgment for the balance due, setting forth two distinct grounds. One basis for the court's ruling, with which we have dealt already in Part II of this opinion, was that Armstrong's falsification of the contract terms to deceive a financial institution rendered the contract unenforceable in his favor. The other reason the court gave for its professed denial of Armstrong's claim for deficiency was that because Armstrong had waited some 133 days after repossessing the equipment from Nelson before he took action to resell it, I.C. § 28–9–505 barred him from further recovery. Notwithstanding the announced rejection of Armstrong's deficiency claim, the court proceeded to set off the $184.80 it had found to be due him under the contract against the $1,000 in punitive damages that it awarded to Nelson because of Armstrong's fraud.

The foregoing course of reasoning inspired the parties to make several assignments of error. Armstrong contends that the court erred in ruling that his delay in reselling the repossessed collateral prevents him from recovering a deficiency judgment. He also asserts that the court computed the balance due under the contract incorrectly by crediting Nelson with a down payment that he never made. Nelson maintains that the trial court was correct in concluding that Armstrong's deficiency judgment should be denied. He argues, however, that in substance the court erroneously awarded Armstrong the balance due on the contract by way of offset against Nelson's compensatory and punitive damages stemming from the fraud. We shall first address the question of whether Armstrong is entitled to recover the balance owing on the contract and then consider how the respective monetary awards to the parties should be calculated.

■ A. In rejecting Armstrong's claim for the balance due under the installment contract, the trial court reasoned that I.C. § 28–9–505 barred recovery of a deficiency judgment because Armstrong held the repossessed collateral for 133 days, or approximately four and a half months, before attempting to resell it. While undue delay in reselling may affect a creditor's claim for a deficiency, this result would not ordinarily flow from I.C. § 28–9–505, and we cannot determine on the record before us whether limiting the deficiency recoverable is otherwise appropriate in this case.

In relevant part, I.C. § 28–9–505,[3] which is Idaho's version of Uniform Commercial Code § 9–505, provides that "a secured party in possession [of collateral] may, after default, propose to retain the collateral in satisfaction of the obligation." The section further provides that written notice of the proposal be sent to the debtor and to other secured parties of whom the proposing secured party has notice. It states finally that "[i]n the absence of . . . written objection the secured party may retain the collateral in satisfaction of the debtor's obligation." The official comment prepared by the drafters of the UCC explains the import of the statute in part as follows: "In lieu of resale or other disposition, the secured party may propose . . . that he keep the collateral as his own, thus discharging the obligation and abandoning any claim for a deficiency."

3. "28–9–505. COMPULSORY DISPOSITION OF COLLATERAL—ACCEPTANCE OF THE COLLATERAL AS DISCHARGE OF OBLIGATION.— . . .

"(2) In any other case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor and except in the case of consumer goods to any other secured party who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or is known by the secured party in possession to have a security interest in it. If the debtor or other person entitled to receive notification objects in writing within thirty (30) days from the receipt of the notification or if any other secured party objects in writing within thirty (30) days after the secured party obtains possession the secured party must dispose of the collateral under 28–9–504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation."

There is nothing in the record before us suggesting that Armstrong ever proposed to Nelson, in writing or otherwise, that Armstrong would retain the collateral in satisfaction of Nelson's indebtedness. Nevertheless, Nelson argues and the trial court apparently held that Armstrong retained the repossessed equipment in discharge of Nelson's obligation.

The claim that a secured party should be held to have retained collateral in satisfaction of a debtor's obligation under UCC § 9–505 even though the secured party never proposed to do so has elicited mixed responses from various courts. *See* Annot., 55 A.L.R.3d 651 (1974). Some courts have considered a specific proposal of retention a prerequisite to precluding the creditor from pursuing the debtor. *Priggen Steel Buildings Co. v. Parsons*, 350 Mass. 62, 213 N.E.2d 252 (Mass.1966). Other courts have not. *Moran v. Holman*, 514 P.2d 817 (Alaska 1973); *Northern Fin. Corp. v. Chatwood Coffee Shop, Inc.*, 4 U.C.C.Rep.Serv. 674 (N.Y.Sup.Ct.1967). In short, the authorities have divided over the question now before us.

■ While strict compliance with the written notice provisions of I.C. § 28–9–505(2) may not be essential where the debtor is claiming that the secured party has retained the collateral, we think that the creditor must in some way have manifested an intent to accept the collateral in full satisfaction of the debtor's obligation. The court's reasoning in *Jones v. Morgan*, 58 Mich.App. 455, 228 N.W.2d 419 (1975), is persuasive:

"Defendant interprets § 9–505(2) to deprive a secured party of the right to sue on a note where he has retained collateral for an unreasonable period. While there is some authority for defendant's interpretation [citations omitted], we think the better interpretation of § 9–505(2) is that it is a provision drafted for the benefit of the secured party by allowing him the option to retain collateral in satisfaction of the debt in certain specified situations and *where he manifests that intent*. A debtor who has been damaged by improper retention of collateral finds his remedy in U.C.C. § 9–507(1) which allows him to recover from the secured party 'any loss caused by a failure to comply with any of the provisions of Part 5 of the Uniform Commercial Code'. If the loss experienced by the debtor equals the amount due on the note, then, of course, the secured party will be entitled to no recovery. The debtor is sufficiently protected by § 9–507(1), without employing a strained reading of § 9–505(2) to imply retention in satisfaction where no such result was intended by the secured party." *Id.* at 423 (emphasis added).

·■ As we view it, I.C. § 28–9–505(2) is not a device for policing the conduct of secured parties *vis-a-vis* their debtors, but rather a statutory analogue to the common law concept of accord and satisfaction. *Cf. Bradford v. Lindsey Chevrolet Co.*, 117 Ga. App. 781, 161 S.E.2d 904 (1968) (satisfaction precluding recovery of deficiency resulted either under UCC or at common law). In Idaho, a debtor seeking to establish a discharge of his indebtedness through accord and satisfaction has the burden of showing that the creditor definitely assented to that arrangement. *See Fairchild v. Mathews*, 91 Idaho 1, 415 P.2d 43 (1966). While the proverbial meeting of the minds is not essential under I.C. § 28–9–505, a debtor seeking to avail himself of the statute's reciprocal protections must still establish that the secured party intended to retain the collateral in lieu of selling it for the debtor's account.

■ The determination of what will sufficiently manifest a secured party's intent to retain collateral in satisfaction of the debtor's obligation must await development in the context of future cases. It is enough for the present to hold that Armstrong's mere failure to attempt resale of farm equipment for a period of four and a half months does not adequately manifest his intent to retain it. Although the passage of that amount of time without action toward resale might reflect such an intention, any number of other circumstances could also explain a creditor's inaction. For example,

the creditor might expect market conditions to improve significantly with a seasonal change or might be obliged to engage in activities other than reselling the collateral or might simply be less than diligent. Thus, as a matter of law, mere failure for four and a half months to pursue resale of heavy equipment is not a basis for inferring the necessary intent on the creditor's part to keep the collateral. *But cf. National Equip. Rental, Ltd. v. Priority Elecs. Corp.*, 435 F.Supp. 236 (E.D.N.Y.1977) (creditor whose agent converted collateral, making resale impossible, held to have retained collateral in satisfaction); *Moran v. Holman*, 514 P.2d 817 (Alaska 1973) (creditor's failure for more than twenty-five months to resell repossessed vehicle and *use* of it for own purposes constituted retention in satisfaction); *Schultz v. Delaware Trust Co.*, 360 A.2d 576 (Del.Super.1976) (question of fact whether creditor's retention of stock certificates for more than five years was retention in satisfaction).

■ Though we have held that Armstrong's delay in reselling the equipment he repossessed from Nelson will not support the trial court's apparent ruling that Armstrong retained the collateral in satisfaction of Nelson's indebtedness, still the delay may be relevant to Armstrong's claim for the balance due on the installment contract. Under I.C. § 28–9–504(3) [4] "every aspect of the [secured party's] disposition [of the collateral] including the method, manner, *time*, place and terms must be *commercially reasonable.*" (Emphasis added.) Failure to sell collateral within a commercially reason-

able time may affect the secured party's claim for a deficiency judgment. *See generally* J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code §§ 26–11, 26–15 (1972). The trial court made no findings concerning the commercial reasonableness of Armstrong's resale of the equipment he repossessed from Nelson. Presumably, the court thought such findings superfluous in light of its holding that Armstrong's deficiency claim was barred under I.C. § 28–9–505. However, in light of our holding that Armstrong cannot be said to have retained the collateral in satisfaction of Nelson's obligation, it will be necessary for the trial court to make findings regarding the commercial reasonableness of the ultimate resale and to determine the legal effect of those findings.

■ B. Armstrong has argued that in computing the balance due on the contract, the trial court improperly credited Nelson with down payments that Nelson did not make. The disputed down payment was contained in the written installment contract which Armstrong maintains does not accurately describe the substance of the Armstrong-Nelson transaction. Armstrong acknowledges, however, that the bottom line on the installment contract corresponds exactly to the bottom line on the bookkeeping invoice that Armstrong says depicts the transaction as it really was. That is, both the installment contract and Armstrong's own records show a cash balance of $9,050 and a deferred balance of $13,109.30. Thus, regardless of which document is used to calculate the balance due from Nelson fol-

---

4. "28–9–504. SECURED PARTY'S RIGHT TO DISPOSE OF COLLATERAL AFTER DEFAULT—EFFECT OF DISPOSITION.— . .

"(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of

the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, and except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or who is known by the secured party to have a security interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale."

lowing his installment payments and Armstrong's resale of the repossessed collateral (as adjusted for commercial unreasonableness, if appropriate), the result must be the same.

Nelson contends that the trial court erred in its approach to the computation of damages, and we must agree. The trial court's mathematical calculations improperly merged the computation of Nelson's fraud damages into the determination of Armstrong's deficiency judgment. In consequence, the court substantially undercut its own holding that Armstrong should recover no deficiency judgment.

On remand, if the court determines that Armstrong is not entitled to any deficiency, it should calculate Nelson's damages for the fraud without regard to the unpaid balance on the contract. If, on the other hand, the court finds that Armstrong is entitled to some deficiency, the court should nevertheless calculate Armstrong's deficiency and Nelson's fraud damages separately. By doing so the court may well avoid the potential pitfalls of a shortcut formula. An offset would of course be permissible when the deficiency and damages have both been computed. *See* I.R.C.P. 54(b).

The trial court's finding that Armstrong defrauded Nelson in the sale of the tractor is affirmed. The court's computation of Nelson's damages and its purported denial of Armstrong's claim for a deficiency judgment based upon public policy and I.C. § 28–9–505 are reversed. The case is remanded for further proceedings consistent with this opinion. As both parties have prevailed in part, each should bear its own costs.

SHEPARD, C. J., and McFADDEN, DONALDSON and BISTLINE, JJ., concur.