923 P.2d 456

James Russel WALSTON, individual,
Plaintiff–Respondent,

v.

MONUMENTAL LIFE INSURANCE
COMPANY, Defendant–
Appellant.

No. 22153.

Supreme Court of Idaho.
Boise, April 1996 Term.

Aug. 29, 1996.

Quane, Smith, Howard & Hull; Givens, Pursley & Huntley, Boise; Sonnenschein, Nath & Rosenthal, Chicago, IL, for appellant. Robert Huntley, Jr. and Alan H. Sliberman argued.

Kenneth L. Pedersen, Twin Falls, for respondent.

SCHROEDER, Justice

Following trial a jury awarded James Walston, an insured in a cancer insurance policy, $3,800 for a breach of contract, $120,000 for damages arising from fraud and bad faith denial of benefits and $10,000,000 in punitive damages. The trial court sustained the verdict on all counts but reduced the punitive damages to $3,200,000 in response to an alternative motion for judgment notwithstanding the verdict, new trial, or remittitur. Monumental Life Insurance Company appeals.

## I.

### BACKGROUND AND PRIOR PROCEEDINGS

Monumental Life Insurance Company (Monumental) sent James Walston (Walston) a solicitation to purchase a cancer expense insurance policy. The solicitation was under the auspices of a Masonic organization and consisted of a two-page promotional pamphlet and a letter composed by Monumental with the signature of the Sovereign Grand Commander of the Supreme Council of the Scottish Rite Brotherhood. The Masonic organization received a payment of $100,000 for use of its name. The brochure contained samplings of policy benefits which indicated limited coverage.

Walston did not read the part of the brochure describing the specific benefits payable. He read and relied upon two parts of the brochure: (1) a headline saying the policy provided "lifetime benefits of up to $250,000" and describing it as a "high-limit" policy, and (2) a set of questions and answers stating, among other things, that benefits were payable regardless of whether other policies or plans provided benefits for the same services. Walston testified that the "lifetime benefits of up to $250,000" caught his eye because the print was in "big black letters."

Walston completed an application for the Monumental policy and signed a statement indicating that, "to the best of [his] knowledge and belief, no person to be insured under this coverage has been treated for any type of cancer for the past five years." The application was dated January 25, 1991. Walston's wife had undergone a second mastectomy for breast cancer on January 10, 1986, just fifteen days outside the five-year period. She then made two follow-up visits to her surgeon on January 31, 1986, and May 25, 1986, both within the five-year period. Walston submitted the application with a $36 quarterly premium. Monumental then issued a certificate of insurance.

In February of 1991, approximately one month after Walston applied for the policy, his wife was diagnosed with lung cancer from which she died on July 11, 1991. Her medical expenses totaled approximately $41,000.

All but $3,000—$4,000 was paid by Medicare and another insurer's Medicare supplemental policy.

Mr. Walston submitted a claim to Monumental for medical services rendered from February 19, 1991, through June, 1991. Mrs. Walston's treatment called for $3,800 in benefits under the terms of the policy. Due to the short time between the application and the diagnosis, a Monumental adjuster checked on whether the cancer involved a pre-existing condition. There was not a pre-existing condition, but the investigation did reveal that Mrs. Walston had follow-up visits within the five-year period before the application. Monumental determined that the post-operative visits constituted treatment and, therefore, considered Mrs. Walston to have been under treatment for cancer from January 6, 1985, to May 25, 1986. Monumental concluded that the representation made by Walston on the application had been false and rescinded the policy.

Walston challenged the characterization of these post-operative visits as "treatment." Monumental persisted in its position that the visits were properly characterized as treatment despite information that they were only check-ups on her condition. Walston sued Monumental, alleging breach of contract, bad faith denial of benefits and rescission of contract, and fraud.

James L. Wadhams, a former Nevada insurance official, was permitted to testify that the mailing sent to Walston violated Idaho insurance department advertising regulations and was designed to deceive. Wadhams testified that advertising the policy as a "high-limit" policy and referencing the $250,000 aggregate limit was misleading because of the internal limits on individual benefits contained within the policy which in fact made it a low-limits policy. It was virtually impossible to reach the overall limit advertised in the policy. In his view the $250,000 limit advertised bore "no relationship to the benefits that will be paid" and violated a regulation limiting use of words or phrases such as "all," "full," "complete," "comprehensive," "unlimited," "up to," and "as high as." Wadhams was also critical of advertising information which implied that this was a special offer that must be acted on in a limited time and the implication in the advertising literature that the policy would pay the cost of simple stage one cancer at a cost of more than $22,000. Additionally, he testified that describing policy limitations in a positive manner so as to imply that they were benefits violated insurance department regulations.

Wadhams testified that the denial of benefits on the basis that Mrs. Walston had undergone treatment within five years was improper, because Monumental imposed an unusual and strained interpretation on the term treatment. He described the way the policy was advertised and adjusted as an extreme deviation of reasonable standards of conduct.

Evidence at trial indicated that Monumental's practices in this case were consistent with its usual way of doing business. The advertisements were mass mailed. The denial of benefits was approved by upper management. Management of Monumental did not see any problem with its conduct and intended to continue doing business in the same manner.

The jury rendered a verdict in favor of Walston, answering the questions propounded as follows:

1. Did defendant breach its contract of insurance with plaintiff? Answer: Yes.

2. If you answered "yes" to question No. 1, what is the amount of damages owed to plaintiff as a result of defendant's breach of contract? Answer: $3,800.00.

3. Did the promotional material provided by defendant to plaintiff relating to a Scottish Rite Group Cancer Expense Protection Plan contain intentional fraudulent misrepresentations? Answer: Yes.

4. Did plaintiff reasonably rely on the misrepresentations in electing to purchase the insurance? Answer: Yes.

5. If you answered "yes" to question Nos. 3 and 4, did the plaintiff suffer damages as a proximate result of the fraudulent conduct? Answer: Yes.

6. Did defendant breach its duty of good faith and fair dealing in its handling of plaintiff's claim? Answer: Yes.

7. If you answered "yes" to question Nos. 5 or 6, what is the additional damage suffered by plaintiff on account of defendant's intentional breach of the duty of good faith and fair dealing and/or fraud? Answer: $120,000.00.

8. Was the conduct of defendant an extreme deviation from the standards of reasonable conduct warranting the imposition of punitive damages? Answer: For fraud? Yes. For breach of duty of good faith and fair dealing? Yes.

9. If you answered "yes" to either part of question No. 8, what is the amount of punitive damages you assess against the defendant? Answer: $10,000,000.00.

The district judge entered judgment in favor of Walston in the amount of $10,123,800 and subsequently awarded pre-judgment interest on the $3,800 amounting to $1,191.75. Thereafter, the district court denied a motion by Monumental for a judgment notwithstanding the verdict for the fraud claim. The court found that "the jury could have found the evidence, presented by the plaintiff, indicated that it would be virtually impossible to reach the lifetime maximum.... While the value of the policy was $250,000, in a theoretical sense, the jury clearly found the representation of value on the brochure was intended to create a belief that the policy would be far more valuable to the consumer than it actually was, considering the actual payment limitation."

The district court also determined that there was sufficient evidence presented at trial to support the claim for bad faith, concluding that "there was sufficient evidence presented for reasonable minds to find that Monumental unreasonably failed to settle Walston's claim." The court declared that the damages allowed in a bad faith action are akin to the damages allowed in an intentional infliction of emotional distress claim.

The district court relied upon *Cuddy Mountain Concrete Inc. v. Citadel Constr. Inc.*, 121 Idaho 220, 824 P.2d 151 (Ct.App. 1992), for factors in determining the appropriateness of punitive damages, referencing the following factors:

In addition to oppressive behavior in a business context, there are other factors which play a determinative role in deciding whether there is substantial evidence of an extreme deviation from standards of reasonable conduct: (1) the presence of expert testimony; (2) whether the unreasonable conduct actually caused harm to the plaintiff; (3) whether there is a special relationship between the parties, as in the *Garnett* insured-insurer relationship; (4) proof of a continuing course of oppressive conduct; and (5) proof of the actor's knowledge of the likely consequences of the conduct.

*Cuddy Mountain,* 121 Idaho at 229–30, 824 P.2d at 160–61. The trial court determined that these factors were present and denied the motion for judgment notwithstanding the verdict on the issue of punitive damages. *Id.* at 230, 824 P.2d at 161.

With respect to Monumental's request for remittitur, the court found the compensatory damages award did not shock the conscience of the court and upheld the jury's award of $120,000, noting that the issue of compensatory damages involves "the seemingly impossible task of assigning a monetary figure to such unquantifiable damage concepts as physical and emotional pain, suffering, trauma and distress," quoting *Quick v. Crane,* 111 Idaho 759, 769, 727 P.2d 1187, 1197 (1986).

In addressing the punitive damages award the court determined that the "jury clearly found that Monumental's handling of this case was malicious and conducted with total disregard for its insured" and noted that the factual basis of this case warranted the imposition of punitive damages. However, the court found the amount awarded by the jury to be "clearly excessive and far greater than the court would have awarded." The court determined that the jury's verdict was "influenced by passion and prejudice" and reduced the punitive damage award to $3,200,000, which represented 5% of Monumental's annual profit.

## II.

### THE TESTIMONY OF JAMES WADHAMS WAS PROPERLY ALLOWED.

James Wadhams, the former Nevada insurance official, was permitted to testify

that the mailing Monumental sent to Walston violated Idaho insurance department advertising regulations. Monumental argues that the testimony was inadmissible because there is no private cause of action under the Unfair Claims Settlement Practices Act. I.C. §§ 41–1301 to –1333 (1991 & Supp.1996). It is well-established and undisputed that Idaho's Unfair Claim Settlement Practices Act does not allow for a private cause of action for a violation of the Act. *See White v. Unigard Mut. Ins. Co.,* 112 Idaho 94, 101, 730 P.2d 1014, 1021 (1986). However, the testimony of Wadhams did not relate to Walston bringing a claim under the Act. The testimony was presented to show insurance industry standards and was properly admitted for that purpose.

Monumental also asserts that Wadhams' testimony was irrelevant to this case and, therefore, should have been excluded. In *Sliman v. Aluminum Co. of Am.,* 112 Idaho 277, 731 P.2d 1267 (1986), *cert. denied,* 486 U.S. 1031, 108 S.Ct. 2013, 100 L.Ed.2d 601 (1988), this Court upheld the admission of testimony from an expert witness in a products liability action. The expert opined that, "the failure to correct this problem, or to warn ... the public about it, is an extreme deviation from the customary practice in the industry." *Id.* at 285, 731 P.2d at 1275. The Court stated, "In Idaho, experts may testify on the ultimate issues or facts so long as their testimony assists the trier of fact. The determination of what will be of assistance to the trier of fact lies within the broad discretion of the trial court." *Id.* (citations omitted). The Court concluded that since the witness was familiar with customary practices in the industry, his testimony as to the defendant's "extreme deviation" from customary practices was relevant to the issue of punitive damages. *Id.*

For the same reasons that were set forth in *Sliman,* 112 Idaho 277, 731 P.2d 1267, Wadhams' testimony was relevant to this case. A violation of the Unfair Claims Settlement Practices Act does not as a matter of law constitute fraud, but evidence of an extreme deviation from customary practices is relevant to the state of mind that is necessary to establish fraud. The district court

could properly determine that the probative value of the testimony outweighed any unfair prejudicial effect. I.R.E. 403.

## III.

## THERE WAS DAMAGE FOR THE PURPOSE OF THE FRAUD CLAIM BY THE PURCHASE OF AN INSURANCE POLICY BASED UPON A MISREPRESENTATION OF ITS COVERAGE.

 The party alleging fraud has the burden of proving the elements of fraud by clear and convincing evidence, as opposed to a less stringent preponderance standard used in ordinary negligence cases. *G & M Farms v. Funk Irrigation Co.,* 119 Idaho 514, 808 P.2d 851 (1991). To establish actionable fraud, also referred to as intentional misrepresentation, a plaintiff must prove the following elements:

(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*Id.* at 518, 808 P.2d at 855. The jury found Monumental's actions to be fraudulent, concluding that the advertising materials contained "intentional fraudulent misrepresentations." Monumental argues that recovery for fraud requires proof of actual pecuniary damages caused by the fraud, relying upon *Nab v. Hills,* 92 Idaho 877, 883, 452 P.2d 981, 987 (1969); *Cooke v. Iverson,* 94 Idaho 929, 931, 500 P.2d 830, 831 (1972); and *Bryant Motors, Inc. v. American States Ins. Cos.,* 118 Idaho 796, 800, 800 P.2d 683, 687 (Ct. App.1990). Monumental maintains that Idaho applies the " 'out-of-pocket' rule which limits the recovery of damages to the difference between the real value of the property purchased and the price paid or contracted for." *Shrives v. Talbot,* 91 Idaho 338, 345,

421 P.2d 133, 140–41 (1966). Monumental argues that Walston failed to prove the element of damages to support a fraud claim for the reason that the policy was worth what Walston paid.

Monumental also asserts that since recovery cannot be had for mental anguish in fraud cases, there is no damage amount that can be attributed to the fraud claim. *Umphrey v. Sprinkel,* 106 Idaho 700, 682 P.2d 1247 (1983). "[R]ecovery cannot be had in an action for deceit for injury to plaintiff's feelings and public disgrace incurred through being deceived through false representations, or for anxiety, worry, and harassment arising from fraud, or from annoyance or inconvenience." *Id.* at 711, 682 P.2d at 1258 (quoting 37 C.J.S. Fraud § 141(f) (1943)).

In *Shrives,* this Court did state that "where the purchaser seeks damages for alleged fraud it appears Idaho is committed to the 'out-of-pocket' rule which limits the recovery of damages to the difference between the real value of the property purchased and the price paid or contracted for." 91 Idaho at 345, 421 P.2d at 140. However, *Shrives* recognized the existence of a different measure of damages—the "benefit-of-bargain" rule—under which the damages allowed are the difference between the real value of the property purchased and the value which it would have had the representations been true:

> This court has often recognized the existence of a different measure of damages referred to as the "benefit-of-bargain" rule, under which the damages allowed are the difference between the real value of the property purchased and the value which it would have had had the representations been true.

*Id.*

The *Shrives* Court recognized that the out-of-pocket rule and the benefit-of-bargain rule "are not exclusive and should only be used when appropriate under the facts," noting the following:

> The underlying principle is that the victim of fraud is entitled to compensation for every wrong which is the natural and proximate result of the fraud. The measure of damages which should be adopted under

the facts of a case is the one which will effect such results.

*Id.* at 346, 421 P.2d at 141 (quoting *Weitzel v. Jukich,* 73 Idaho 301, 251 P.2d 542 (1952)).

In *Nelson v. Armstrong,* 99 Idaho 422, 582 P.2d 1100 (1978), the Court noted that the out-of-pocket measure of damages has been adopted by Idaho Courts, citing *Shrives.* The Court noted, however, that under some circumstances "the Court has applied the 'benefit of the bargain' test, measuring damages by the difference between the value of the thing actually received and the value it would have had if it were as it was fraudulently represented to be." *Id.* at 427 n. 1, 582 P.2d at 1105 n. 1; *see also Layh v. Jonas,* 96 Idaho 688, 535 P.2d 661 (1975).

In *Layh v. Jonas,* an insured was fraudulently induced to purchase medical insurance based on an assertion that a heart condition would not be considered a pre-existing condition. 96 Idaho at 688, 535 P.2d at 661. The insured sought reformation of the contract, which would result in coverage of her medical expenses. This Court distinguished *Shrives* and held the following:

> [I]n the case at bar the court is required to resolve the question of the measure of damages or injury where as here a written contract is sought to be reformed on the basis of alleged fraudulent misrepresentation in the inducement. We hold that the "benefit of the bargain rule" should be applied in such cases rather than the out-of-pocket rule. . . . Particularly in cases involving insurance policies we note that the out-of-pocket rule would permit a seller to make any representation however fraudulent, extravagant, or untrue and the policy holder would be without remedy insolong as benefits in excess of premium amounts were received by the policy holder.

*Layh,* 96 Idaho at 691, 535 P.2d at 664.

Walston is seeking damages for Monumental's fraudulent representation rather than reformation of the insurance policy as was sought in *Layh.* However, the reasoning of *Layh* is applicable. Idaho is among a minority of states which follow the out-of-pocket damages rule for damages in fraud cases,

*Umphrey*, 106 Idaho at 710, 682 P.2d at 1257, but this is not exclusive. The rationale of *Layh* indicates that the damages in this case would be the difference between the real value of the insurance policy purchased and the value which it would have had the representation been true—the "benefit-of-bargain rule." Walston was led to believe that he was purchasing a high-value policy when he actually purchased a low-value policy. Walston has made an adequate showing of damage to support the jury's finding of fraud.

## IV.

### THE JURY INSTRUCTION WHICH COMBINED THE CLAIM FOR BAD FAITH AND FRAUD WAS HARMLESS ERROR.

 The district court gave a jury instruction which combined the bad faith denial of benefits tort and fraud for the purpose of determining damages. The jury rendered a special verdict which awarded Walston $120,000 based on Monumental's bad faith and fraudulent conduct. There is no breakdown as to how much of that award is attributable to each cause of action. This is problematic because the elements of damage for each cause of action are not necessarily the same. According to *Umphrey v. Sprinkel*, 106 Idaho at 711, 682 P.2d at 1258, "recovery cannot be had for mental anguish in fraud cases." However, mental anguish may be an element of damage with the tort of bad faith in insurance contracts.

Monumental asserts that it was prejudiced by this instruction and that a new trial must occur. In *O'Neil v. Schuckardt*, 112 Idaho 472, 733 P.2d 693 (1986), this Court remanded a case for a new trial because it was impossible to determine what portion of a $250,000 verdict was awarded for alienation of affection, which was abolished by the Court, and what portion was awarded for invasion of privacy. 112 Idaho at 480, 733 P.2d at 701. Consequently, if the fraud verdict did not stand in this case, it would be proper to remand for a new trial. However, the fraud verdict is valid, and it must then be determined if Monumental was prejudiced by the jury instruction on damages.

At trial Walston proposed a jury instruction which only addressed damages for a bad faith claim and a special verdict form which set forth a separate damage line for bad faith and fraud. Monumental made a blanket objection to all instructions it did not propose, but Monumental did not propose either instructions or a special verdict addressing the issue. Despite objecting to the verdict form that separated damages for bad faith and fraud, Monumental asserts that the bad faith and fraud causes of action should not have been considered together for the purpose of damages.

The judge modified Walston's proposed special verdict to combine fraud and bad faith in the belief that the elements of damage were coextensive, and combining would avoid the problem of double recovery. Counsel for Walston questioned whether emotional distress damages for fraud were allowable, but the court indicated they were. Monumental interposed no specific objection to combining the two theories for purposes of damages. The jury found Monumental liable on both theories.

While combining the bad faith and fraud theories for purposes of determining damages was error, since emotional distress damages are not awardable for fraud, the error is harmless. The combining did eliminate the possibility of a double recovery. As discussed later, emotional distress damages are awardable for the bad faith claim. The evidence of fraud was properly before the jury to establish that claim and was also relevant on the claim of bad faith to establish the state of mind and practices of Monumental. Therefore, the error in combining the theories for purposes of determining damages was harmless.

## V.

### EMOTIONAL DISTRESS DAMAGES WERE A PROPER ELEMENT OF DAMAGES FOR THE BAD FAITH CLAIM.

 The jury awarded $120,000 for the claim based on the breach of the duty of good

faith and fair dealing in the handling of Walston's claim, the bad faith denial of benefits claim. A review of the trial record indicates that there were no damages for out-of-pocket expenses or other financial losses since the $3,800 amount was awarded elsewhere for the breach of contract. The only element of damage left is what falls into the category of emotional distress.

In *Brown v. Fritz*, 108 Idaho 357, 699 P.2d 1371 (1985), this Court held that there can be no recovery for emotional distress suffered by a plaintiff in a breach of contract claim. *Id.* at 363, 699 P.2d at 1377:

> We hold that there is no significant, if in fact any, difference between conduct by a defendant which may be seen to justify an award of punitive damages, and conduct which may justify an award of damages for emotional distress. Justification for an award of damages for emotional distress seems to lie not in whether emotional distress was actually suffered by a plaintiff, but rather in the quantum of outrageousness of the defendant's conduct.

*Id.* at 362, 699 P.2d at 1376.

The next year this Court determined that "when an insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." *White v. Unigard Mut. Ins. Co.*, 112 Idaho 94, 96, 730 P.2d 1014, 1016 (1986) (quoting *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973)). In *White* this Court announced the following rule:

> [W]here an insurer "intentionally and unreasonably denies or delays payment" on a claim, and in the process harms the claimant in such a way not fully compensable at contract, the claimant can bring an action in tort to recover for the harm done. The availability of an action for bad faith will provide incentive to insurers to honor their implied covenant to the insureds.

112 Idaho at 98–99, 730 P.2d at 1018–19 (footnotes and citation omitted). This Court has also recognized a "special relationship" between an insured and insurer due to the adhesionary aspects of the insurance contract. *Id.* at 99, 730 P.2d at 1019. *White* provided the following summary:

The tort of bad faith breach of insurance contract, then, has its foundations in the common law covenant of good faith and fair dealing and is founded upon the unique relationship of the insurer and the insured, the adhesionary nature of the insurance contract including the potential for overreaching on the part of the insurer, and the unique, "non-commercial" aspect of the insurance contract. Accordingly, we hold that there exists a common law tort action, distinct from an action on the contract, for an insurer's bad faith in settling the first party claims of its insured.

112 Idaho at 100, 730 P.2d at 1020. Monumental argues that nothing in *White* abrogates the limitation set forth in *Brown,* asserting that a plaintiff can maintain an independent cause of action for bad faith but cannot recover emotional distress damages.

 Based on the common law tort set forth in *White,* a plaintiff who has proven bad faith by an insurer can recover damages normally recoverable in a tort case. A federal district court case has set forth the framework for the two types of emotional distress claims—negligent and intentional infliction of emotional distress. *Windsor v. Guarantee Trust Life Ins. Co.*, 684 F.Supp. 630, 632 (D.Idaho 1988). For a claim of negligent infliction of emotional distress to arise, there must be physical injury to the plaintiff. *Id.* at 632 (citing *Gill v. Brown,* 107 Idaho 1137, 695 P.2d 1276 (Ct.App.1985)). There is no evidence of a physical manifestation of injury for Mr. Walston, and that has not been argued on appeal.

 On the other hand, "[a]n action for intentional infliction of emotional distress will lie only where there is extreme and outrageous conduct coupled with severe emotional distress." *Davis v. Gage,* 106 Idaho 735, 741, 682 P.2d 1282, 1288 (Ct.App.1984), *appeal after remand,* 109 Idaho 1029, 712 P.2d 730 (Ct.App.1985). The *Davis* Court concluded that evidence showing that the plaintiff was "upset, embarrassed, angered, bothered and depressed" did not demonstrate a severely disabling emotional condition adequate for intentional infliction of emotional distress

damages. 106 Idaho at 741, 682 P.2d at 1288.

It is apparent that the $120,000 damage award consists of emotional distress damages. It is necessary to determine if Monumental's conduct was "extreme outrageous conduct" to support the damage award. In this case the jury could properly find that Monumental engaged in extreme outrageous conduct. After marketing a policy utilizing misrepresentations as to the scope and nature of its coverage, it denied coverage on a specious theory involving an interpretation of the term "treatment" that would exclude coverage for anybody who had check-ups following an incident of cancer. Monumental impugned Walston's character and drew him into a prolonged dispute when he was grieving the loss of his wife. The jury could reasonably determine that this was extreme outrageous conduct.

■ The next question is whether there is a problem with the award for emotional distress coexisting with the punitive damage award. The *Brown* Court commented that "there is no significant, if in fact any, difference between conduct by a defendant which may be seen to justify an award of punitive damages, and conduct which may justify an award of damages for emotional distress." 108 Idaho at 362, 699 P.2d at 1376. While the conduct giving rise to a claim for emotional distress and a claim for punitive damages may be of the same quality, it does not follow that the award of damages is either duplicative or must be co-extensive. The emotional distress damages are awardable for a condition particular to the aggrieved party. Punitive damages are awardable primarily to deter future bad conduct. There need be no overlap between the two. In this case the trial court reviewed the awards and reduced the punitive damage award, cognizant of the award for bad faith. It is a reasonable conclusion that the trial court did not perceive a problem with overlapping damages following the reduction. In fact the trial court keyed the punitive damage award to the profits of Monumental, not the stress suffered by Walston.

## VI.

### THERE IS ADEQUATE EVIDENCE TO SUPPORT THE AWARD OF PUNITIVE DAMAGES.

■ In actions seeking recovery of punitive damages, "the claimant must prove, by a preponderance of the evidence, oppressive, fraudulent, wanton, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted." I.C. § 6–1604(1) (1990).

■ In *Cheney v. Palos Verdes Inv. Corp.*, 104 Idaho 897, 665 P.2d 661 (1983), this Court stated the following:

An award of punitive damages will be sustained on appeal only when it is shown that the defendant acted in a manner that was "an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or disregard for its likely consequences." The justification for punitive damages must be that the defendant acted with an extremely harmful state of mind, whether that be termed "malice, oppression, fraud or gross negligence;" "malice, oppression, wantonness;" or simply "deliberate or willful."

*Id.* at 905, 665 P.2d at 669 (citations omitted). The decision of a trial court to allow the jury to consider punitive damages rests within the discretion of the trial court. *Soria v. Sierra Pac. Airlines, Inc.*, 111 Idaho 594, 611, 726 P.2d 706, 723 (1986). The standard of review for punitive damages is to determine if the trial court abused its discretion in allowing the jury to consider punitive damages. *Spence v. Howell*, 126 Idaho 763, 772, 890 P.2d 714, 723 (1995). This Court has interpreted the abuse-of-discretion standard as a "substantial evidence standard." *Garnett v. Transamerica Ins. Servs.*, 118 Idaho 769, 781, 800 P.2d 656, 668 (1990).

In the case at hand the jury awarded $10 million in punitive damages. Monumental moved in the alternative for judgment not withstanding the verdict, new trial or remittitur. The district court granted a remittitur reducing the punitive damage award to $3.2 million or in the alternative a new trial. In

*Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187 (1986), this Court stated the rule that a trial court must follow when deciding a motion made pursuant to I.R.C.P. 59(a)(5):

> *Where* a motion for a new trial is premised on inadequate or excessive damages, the trial court *must* weigh the evidence and then compare the jury's award to what he would have given had there been no jury. If the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the verdict ought not stand. It need not be proven that there was in fact passion or prejudice nor is it necessary to point to such in the record. The appearance of such is sufficient. A trial court is not restricted to ruling a verdict inadequate or excessive as a 'matter of law.' Additionally, the rule that a verdict will not be set aside when supported by substantial but conflicting evidence has no application to [a] trial court ruling upon a motion for a new trial.

*Quick*, 111 Idaho at 768, 727 P.2d at 1196 (quoting *Dinneen v. Finch*, 100 Idaho 620–25, 603 P.2d 575, 579–80 (1979)), (citations omitted).

 "Appellate review of the trial court's exercise of discretion in this regard focuses upon the reasons stated by the trial court for granting or denying a motion for new trial and/or alternative additurs or remittiturs. The trial court must state its reasons with particularity unless those reasons are obvious from the record itself." *Cuddy Mountain Concrete v. Citadel Constr.*, 121 Idaho at 231, 824 P.2d at 162. The district court set forth its reasoning for granting the remittitur and reducing the punitive damage award to $3.2 million, stating the following concerning the amount of punitive damages:

> Mindful of the jury's goal of deterring Monumental and other companies from engaging in bad faith settlement of insurance claims, the court has arrived at an amount which will accomplish that goal. Therefore, a new trial will be ordered unless the plaintiff accepts punitive damages in the amount of $3,200,000, which represents 5% of Monumental's annual profit, in addition to the $120,000 compensatory and $3,800

contractual damages awarded. The court finds this amount to be sufficient to deter Monumental, or similarly situated insurance companies, from future bad faith settlement of claims and that this amount is great enough to get the company's attention.

 "It is well established in this state that punitive damages may be awarded when the defendant has committed fraud." *Umphrey v. Sprinkel*, 106 Idaho at 710, 682 P.2d at 1257. Additionally, exemplary damage awards are appropriate when the defendant is engaged in deceptive business practices operated for profit posing danger to the general public. *Id.* The jury found that Monumental had made fraudulent misrepresentations, and evidence in the record supports that finding.

 In general, the primary purpose behind an award for punitive damages is to deter similar conduct from happening again in the future. *Umphrey*, 106 Idaho at 710, 682 P.2d at 1257. "It is well settled that punitive damage are not favored in the law and should be awarded only in the most unusual and compelling circumstances, and are to be awarded cautiously and within narrow limits." *Manning v. Twin Falls Clinic & Hosp.*, 122 Idaho 47, 52, 830 P.2d 1185, 1190 (1992).

A case similar to the case before the Court supports the district court's imposition of punitive damages. *Linscott v. Rainier Nat'l Life Ins. Co.*, 100 Idaho 854, 606 P.2d 958 (1980). In *Linscott*, parents purchased three medical insurance policies for their daughter. *Id.* at 856, 606 P.2d at 960. The daughter died almost a year following the purchase of the policies, after spending 57 days in various hospitals. Rainier declared its intent to rescind the policies on the ground that the insured had not disclosed her epilepsy, which the insurer claimed not to insure. *Id.* The trial court awarded $20,000 in punitive damages, and this Court found that the award was supported by the record:

> The evidence therefore shows, first, that Rainier Life's refusal to honor the policies was totally unjustified; and, second, that even had it proved that [the daughter] had

epilepsy and that she had not disclosed this on the application forms, it still attempted to go further than it could have by claiming to rescind the policies. The evidence suggests that the insurance company was acting in bad faith. *Id.* at 861, 606 P.2d at 965. In *Linscott* the Court denied recovery for mental anguish; however, the case was decided before *White,* which recognized the tort of bad faith for this type of insurance case.

The facts of this case establish deceptive marketing practices by Monumental which are likely to continue if not deterred. The facts also establish bad faith denial of benefits practices which will continue if not deterred. The district court determined that a $3.2 million punitive damage award would deter Monumental and other companies. The district court arrived at this amount by calculating 5% of Monumental's annual profit. This is a reasonable method of determining an appropriate amount for deterrent purposes.

## VII.

## THE PUNITIVE DAMAGE AWARD DOES NOT VIOLATE DUE PROCESS STANDARDS.

■ Subsequent to submission of this case the United States Supreme Court decided the case of *BMW of North America, Inc. v. Gore,* —— U.S. ——, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), in which it determined that a $2,000,000 punitive damage award violated due process standards. The U.S. Supreme Court recognized that punitive damages may be imposed to further a state's legitimate interest in punishing unlawful conduct and deterring repetition. *Id.* at ——, 116 S.Ct. at 1595. However, when an award is grossly excessive in relationship to those interests it violates the due process clause of the Fourteenth Amendment. *Id.* The Court noted that a state may protect its citizens by prohibiting deceptive trade practices and requiring automobile distributors to disclose pre-sale repairs that influence the value of a new car. However, the record reflected that there was no uniform method of protecting this interest throughout the states. The U.S. Supreme Court described the status of the law in this regard as a "patchwork of rules representing the diverse policy judgments of lawmakers in 50 States." *Id.* at ——, 116 S.Ct. at 1596.

This Court will not set forth the fraud laws of all of the states, but it is safe to say that the definitions of fraud from one state to another contain the same major elements. Similarly, there may be variations from state to state in the definition of bad faith denial of benefits practices, but it can safely be said that bad faith denials are reprehensible in any state, and an aggrieved litigant may find a remedy through contract or tort law.

It is highly unlikely that the decision in this case infringes on the interest of other states, because it is highly unlikely that any state sanctions, approves, or trivializes fraud or bad faith settlement practices. The evidence in *BMW v. Gore,* indicates that approximately 60 percent of the vehicles that were refinished were sold in states where failure to disclose the repair was not an unfair trade practice. *Id.* at ——, 116 S.Ct. at 1598. The issues in this case are more fundamental in their application throughout the states.

In analyzing whether the award was grossly excessive in *BMW v. Gore,* the U.S. Supreme Court commented as follows:

> Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. As the Court stated nearly 150 years ago, exemplary damages imposed on a defendant should reflect "the enormity of his offense."

*Id.* at ——, 116 S.Ct. at 1599 (quoting *Day v. Woodworth,* 13 How. 363, 54 U.S. 363, 14 L.Ed. 181 (1852)) (footnote omitted).

Repainting BMWs prior to sale does not rise high on the level of reprehensibility. Misrepresenting insurance coverage and refusal to pay a claim that any reasonable person would say was due does rise high on the reprehensibility scale. Monumental bought its way into Walston's door as a business endorsed by a Masonic organization that he felt he could trust. Monumental

utilized deceptive practices in promoting its policy, including the representation that it was providing high limits coverage when the limits were quite low. Monumental refused to pay a claim on an unreasonable definition of treatment and steadfastly held to its position.

The U.S. Supreme Court commented in *BMW* that the record disclosed no "deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive ..." *Id.* at ——, 116 S.Ct. at 1601. The record in this case demonstrates the existence of deliberate false statements and acts of affirmative misconduct.

The U.S. Supreme Court analyzed the ratio of the punitive damage award to the actual harm inflicted on the plaintiff, stating that the exemplary damages must bear a reasonable relationship to compensatory damages. Referring to its prior decision in *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24, 111 S.Ct. 1032, 1046–47, 113 L.Ed.2d 1 (1991), the Court indicated that a punitive damages award of more than four times the amount of compensatory damages might be close to the line, but it did not cross the line into the area of constitutional impropriety. *Id.* at ——, 116 S.Ct. at 1602. The Court then commented that in the subsequent case of *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 460, 113 S.Ct. 2711, 2721–22, 125 L.Ed.2d 366 (1993), it refined the analysis into whether there was a reasonable relationship between the punitive damages award and the harm likely to result from the conduct as well as the harm that had actually occurred, suggesting that the relevant ratio was not more than 10 to 1. *Id.* The punitive damage award in *BMW* was 500 times the amount of the actual harm.

The jury in this case determined that Walston suffered $3,800 harm for breach of the contract and $120,000 in compensatory damages for emotional distress, combining for a damage award of $123,800. This is a ratio of just under 26 to 1, which is greater than the ratio in *TXO*. However, the U.S. Supreme Court in *BMW* made it clear that it was not prescribing a mathematical formula to be followed. *Id.* at —— – ——, 116 S.Ct. at 1602–03.

The *BMW* court analyzed the relationship of the exemplary damage award to the statutory fines available and the question of whether a lesser deterrent would have protected the interest of Alabama's consumers. In this case the district judge articulated a basis for the remitted amount, keying that amount to a percentage of Monumental's profits. That is a reasonable basis to assure that the interests of this state's consumers are protected from the type of conduct engaged in by Monumental.

A question is raised in BMW as to whether BMW was placed on adequate notice of the severity of the sanction that might fall on it in Alabama from its deceptive practices. In Idaho punitive damages have long been allowed, and the special relationship between an insurer and an insured has been well defined. The state has set standards of practice in the insurance industry. There is no doubt that Monumental knew, if it paid attention, that severe penalties could follow from fraud in marketing and bad faith denial of benefits practices. Buying a health insurance policy is significantly different from buying a BMW. Marketing a car that may not be quite as pretty as it should be is a long way from marketing health insurance upon which people rely for their financial security. The emotional impact of purchasing a car that may have a lesser paint job does not equate with the grueling emotional distress of fighting over insurance after the death of one's companion for life.

The punitive damage award in this case does not offend any constitutional standards.

## VIII.

## CONCLUSION

The decision of the district court is affirmed. Costs on appeal are awarded to the respondent.

McDEVITT, C.J., and JOHNSON, TROUT and SILAK, JJ., concur.