W. JONES, Justice,
dissenting:
I respectfully dissent for the following reasons:
I. Liberty Mutual Did Not Breach the UM Provisions of the Insurance Contract
Linda Weinstein and her daughter, Sarah, were involved in a car accident caused by an uninsured motorist. They submitted medical bills for Sarah’s injuries to Liberty Mutual pursuant to the uninsured motorist (“UM”) provision of their automobile-insurance policy, which provided: “Our payment is based on the amount that an insured is legally entitled to recover for bodily injury but could not collect from the owner or operator of the uninsured motor vehicle because [the owner or operator is not insured].” (Original emphases omitted; new emphasis added). Liberty Mutual admitted that the uninsured motorist was at fault, but refused to pay the bills piecemeal under the UM coverage, stating that it would only entertain offers to settle the entire UM claim at one time. Liberty Mutual indicated that it would wait until the medical prognosis for Sarah’s injuries was sufficiently clear before offering to settle the claim for her future expenses.
When the Weinsteins sued Liberty Mutual under their UM policy, Liberty Mutual paid all the undisputed bills plus interest. It consistently maintained before and throughout trial, however, that it had no contractual duty to pay individual bills piecemeal as they arrived. This position is correct, and for that reason Liberty Mutual should have been granted a directed verdict or a judgment notwithstanding the verdict.

1. Liberty Mutual Properly Preserved the Multiple-Payments Issue for Appeal

It is the appellant’s duty “to not only clearly state its contentions to the trial judge, but to make such contentions, and the rulings thereon, of record so they may be reviewed on appeal.” Van Velson Corp. v. Westwood Mall Assocs., 126 Idaho 401, 406, 884 P.2d 414, 419 (1994). “[E]ither the specific ground for the objection must be clearly stated, or the basis of the objection must be apparent from the context.” Slack v. Kelleher, 140 Idaho 916, 921, 104 P.3d 958, 963 (2004).
Liberty Mutual repeatedly raised the issue that the jury should not be permitted to find a breach of contract when an insurer refuses to pay piecemeal medical bills under UM coverage. First, in its motion for a directed verdict, Liberty Mutual argued for six pages that UM carriers have no duty “to process a UM claim in a piecemeal basis, like a type of medical payments coverage.” Second, in its written objection to the Weinsteins’ proposed jury instructions, Liberty Mutual similarly contended that the instructions incorrectly suggested that “multiple claims are possible under UM where the Policy only provides for a single claim and single payment.” Third, Liberty Mutual again argued for several pages in its motion for judgment notwithstanding the verdict that “there is no contract provision or independent duty to make multiple piecemeal payments.”
Most importantly, Liberty Mutual expressly objected to Instruction 25 on the record. Instruction 25 encapsulated the multiple-payment issue, stating, “A fairly debatable dispute as to a portion of a claim does not relieve an insurance company from paying the undisputed portion of a claim within a reasonable period of time after it has assessed the monetary value of the undisputed portion of the claim.” During the jury-instruction conference, Liberty Mutual provoked an extensive debate by objecting to Instruction 25, arguing that it had no duty to pay undisputed amounts until the entire UM claim could be evaluated. Liberty Mutual even interrupted the trial judge to ensure that the record contained its proposed in *342 stmction, which would have read, “A fairly debatable dispute as to the claim does not relieve an insurance company from paying the undisputed portion of the claim within a reasonable time after it has assessed the claim.” The judge rejected the proffered instruction on the record. The multiple-payment issue was therefore amply preserved for appeal.
The majority opinion nonetheless contends that Liberty Mutual waived the issue by stipulating to Instruction 13, which told the jury the following:
6. In insurance cases money becomes due as provided under the express terms of the insurance contract.
7. If an insurance policy may be given either of two reasonable meanings, one which permits recovery and one which does not, the meaning more favorable to the insured should be adopted.
9. When a contract expresses no specific time for its performance, the law implies that it is to be performed within a reasonable time, as determined by the subject matter of the contract, the situation of the parties, and the circumstances attending the performance.
Even though Liberty Mutual argued in its brief that it had no duty to deliver piecemeal medical payments, the majority maintains that Liberty Mutual waived the issue altogether by stipulating to these separate instructions.
These jury instructions accurately state established law and are consistent with Liberty Mutual’s theory about the case. Neither party has ever disputed the general principles that the express terms of the contract govern the timing of insurance benefits, that an ambiguous policy should be construed against the insurer, or that a contract must be performed within a reasonable amount of time if no time is set in the contract.
Liberty Mutual’s theory, however, was that a UM policy by its very nature is unambiguous that no duty to pay UM benefits arises until the insurer can settle the entire claim. As Liberty Mutual asserted during the jury-instruction conference, a UM policy does not require performance until the insurer has “had the opportunity to evaluate the claim,” including both the disputed and undisputed components. After the entire claim is evaluated, then the insurer must perform within a reasonable time if no time is provided in the contract. Since, as explained below, it is widely accepted that an insurer may settle a UM claim all at once, a settlement must be made within a reasonable time only after the whole claim can be evaluated. It was therefore perfectly consistent for Liberty Mutual to stipulate to Instruction 13.
Liberty Mutual also consented to another instruction, which required the jury to find “ ‘that payments [plural] were not timely made,’ ” before there could be a breach of the UM policy. Even if a single letter could derail the most important thrust of Liberty Mutual’s appeal, Liberty Mutual could have consented to such an instruction without waiving the multiple-payments issue. Again, Liberty Mutual asserted at trial that it had no duty to pay on a UM claim until the entire claim could be evaluated. After the claim is evaluated, it is irrelevant whether the insurer makes one or multiple payments. The dispute was instead encapsulated in Instruction 25, which explicitly directed the jury to assume that multiple payments could become due on a UM claim before it could be evaluated in its entirety.

2. Liberty Mutual Did Not Breach the Insurance Contract by Requiring the Weinsteins to Settle Their Entire UM Claim

This Court has never explained an insurer’s contractual duties toward an insured seeking piecemeal payment of medical bills under a UM insurance policy. It has only upheld a breach-of-contract claim where the insurer refused to timely respond to the UM claimant’s settlement offer. Brinkman v. Aid Ins. Co., 115 Idaho 346, 350, 766 P.2d 1227, 1231 (1988); see also Parsons v. Mut. of Enumclaw Ins. Co., 143 Idaho 743, 745-48, 152 P.3d 614, 616-19 (2007) (upholding an award of attorney fees for insurance compa *343 ny’s tardy settlement offer).[7]
The Court’s opinion views the UM provision here as ambiguous, but the provision was not ambiguous just because Idaho law has not clarified a UM provider’s duties to its insureds. Of course, the trier of fact is to interpret ambiguous contract language against the insurer, Cascade Auto Glass, Inc. v. Idaho Farm Bureau Ins. Co., 141 Idaho 660, 663, 115 P.3d 751, 754 (2005), and the terms “payment” and “legally entitled to recover” are not defined in the policy. However, “not every word and phrase in an insurance contract needs to be defined in the contract.” National Union Fire Ins. Co. v. Dixon, 141 Idaho 537, 540, 112 P.3d 825, 828 (2005). “[T]he mere fact that a term is undefined in a policy does not make the term ambiguous if it has a settled legal meaning.” Melichar v. State Farm Fire & Cas. Co., 143 Idaho 716, 721, 152 P.3d 587, 592 (2007). “[Wjhere a word or phrase used in an insurance contract has a settled legal meaning or interpretation, that meaning or interpretation will be given effect although other interpretations are possible.” Nielsen v. Provident Life & Accid. Ins. Co., 100 Idaho 223, 226, 596 P.2d 95, 98 (1979) (citing Stein-McMurray Ins. Inc. v. Highlands Ins. Co., 95 Idaho 818, 820, 520 P.2d 865, 867 (1974)). This can include looking to the decisions of other states interpreting the same contract language. See Dixon, 141 Idaho at 540, 112 P.3d at 828 (citing a Pennsylvania case).
The district court erred by permitting the jury to determine when medical payments were due on the Weinstein’s UM “claim” because, under the unambiguous terms of the policy, they never made a claim in the first place. No policy provision specifically governed the timing and frequency of UM disbursements, so the parties expended considerable time debating whether the policy terms in this case provided only for a single “payment.” But whether the contract uses the word “payment” or its plural is irrelevant because the language in this policy has a well-settled legal meaning. Like virtually all UM policies nationwide, the contract in this case states that Liberty Mutual’s “payment” is based on “the amount that an insured is legally entitled to recover for bodily injury but could not collect from the owner or operator of the uninsured motor vehicle.” (Emphasis added). As explained below, Liberty Mutual used nationally uniform contract language in its UM policy. The law throughout the country is that the term “legally entitled to recover” does not obligate the insurer to pay under a UM policy until the claimant can establish the tortfeasor’s liability and the extent of damages. 46A C.J.S. Insurance § 2331. The district court should not have viewed the policy as ambiguous as to whether multiple payments were due. Further, because Liberty Mutual had the right to wait until all of Sarah’s damages were reasonably clear or until the insured made a claim for a single amount they would accept as the full extent of damages before offering payment, there was no breach of contract.
There was no factual issue for the jury to settle. This is because “[m]ost courts reason ... that the language ‘legally entitled to recover’ is clear and unambiguous.” Matarese v. New Hampshire Mun. Ass’n Property Liability Ins. Trust, 147 N.H. 396, 791 A.2d 175, 181 (2002); accord Perkins v. Insurance Co. of N. Am., 799 F.2d 955, 962 (5th Cir.1986) (applying Mississippi law); State Farm Mut. Auto. Ins. Co. v. Royston, 72 Haw. 338, 817 P.2d 118, 121 (1991). When interpreting what a UM claimant is “legally entitled to recover,” the universal rule is that “[t]he insured must be able to establish fault on the part of the uninsured motorist which gives rise to the damages and to prove the extent of those damages.” Patrons Mut. Ins. Ass’n v. Norwood, 231 Kan. 709, 647 P.2d 1335,1338 (1982) (quotation omitted; empha *344 sis added).[8] Because the claimant must be able to show the extent of his or her damages, “a bad faith claim either does not exist or should be held in abeyance until there is a final resolution of the contractual coverage claim.” Martin v. State Farm, Mut. Auto. Ins. Co., 960 F.Supp. 233, 236 (D.Nev.1997); accord 46A C.J.S. Insurance § 2331 (2009); Vest v. Travelers Ins. Co., 753 So.2d 1270, 1276 (Fla.2000) (stating that a bad-faith action “is premature until there is a determination of liability and extent of damages owed”). Successful bad-faith claims therefore invariably involve the insurance company’s failure to settle in good faith, not a failure to pay individual medical bills. E.g. Pemberton v. Farmers Ins. Exch., 109 Nev. 789, 858 P.2d 380, 381 (1993); State Farm, Mut. Auto. Ins. Co. v. Shrader, 882 P.2d 813, 828 (Wyo.1994). There is no UM “claim” until the claimant is ready to show the extent of damages caused by the tortfeasor, which is not established by submitting individual medical bills as they come in. Submitting individual bills shows nothing more than part of the damages. Since the Weinsteins refused to settle for a single amount constituting the extent of damages they were legally entitled to recover from the tortfeasor, they simply never made a claim.
Because a UM carrier’s liability is tied to the third-party tortfeasor’s liability, UM claims present a more complex situation for insurers. For example, the Superior Court of Pennsylvania characterizes UM claims as “hybrid claims that involve elements of both first party claims and third party claims.” Condio v. Erie Ins. Exch., 899 A.2d 1136, 1143 (Pa.Super.2006); accord Ex Parte Safeway Ins. Co., 990 So.2d 344, 351 (Ala.2008). Of course, UM claims are similar to first-party claims in that the insured is claiming directly against the insurer and is entitled to notice of the rights and benefits under the policy. Id. at 1144. There are, however, real differences between the two types of coverage:
U-claims[9] are like third party claims because the contract of insurance sets them up that way. The traditional insuring agreement contained in the Uninsured and/or Underinsured Motorist section of the policy provides that the insurer agrees to pay to the insured the amount that the insured would otherwise be legally entitled to recover from the owner or operator of an uninsured or underinsured motor vehicle.
U-claims are like third party claims because the insured is naturally and inherently seeking to maximize his recovery of general damages, while the insurer seeks, within reasonable limits, to minimize that recovery. U-claims bear another similarity to third party claims insofar as each side is entitled, but not required, to have legal counsel, charged with the role and responsibility of advocating the interest of his or her client.
U-claims are also like third party claims in the practical sense of the presentation of issues and positions which can arise in the claim.
*345 Condio, 899 A.2d at 1143 (citation omitted); see also Craft v. Econ. Fire & Cas. Co., 572 F.2d 565, 569 (7th Cir.1978) (“In the uninsured motorist situation there is no element of ‘control’ of the insured’s side of the litigation by the insurance company which would give rise to a ‘fiduciary’ duty.”). The duty of good faith does not “require an insurer to sacrifice its own interests by blindly paying each and every claim submitted by an insured in order to avoid a bad faith lawsuit.” Condio, 899 A.2d at 1145.
Thus, because insurance companies have different incentives and obligations when dealing with UM claims, they must be permitted to treat UM claimants differently from classic first-party claimants. UM coverage “is neither an all-risk insurance designed to provide coverage for all injuries incurred, nor is it a no-fault motor vehicle insurance that provides coverage without regard to whether a plaintiff is legally entitled to recover damages from an uninsured or unidentified motorist.” Master v. State Farm Mut. Auto. Ins. Co., 894 S.W.2d 633, 635 (Ky.1995). “[B]y attempting to regulate the adversarial relationship created by the uninsured motorist coverage, the result may be to diminish that adversarial relationship to the point of turning the coverage into something more like a first-party coverage than what it was designed and conceived to be.” William A. Mayhew, Bad Faith and the Uninsured Motorist Claim, 19 Forum 618, 636 (1984). Requiring insurers to pay medical bills on demand as the Court’s opinion holds would essentially turn UM policies into a form of medical insurance for claimants injured by inadequately insured drivers. That has never been the purpose of a UM policy.
I have found no authority anywhere suggesting that UM claimants and ordinary first-party claimants have the same relationship to the insurance company. Instead, the goal is “to afford the same protection to a person injured by an uninsured motorist as would have been enjoyed had the tortfeasor carried liability insurance.” Ryals v. State Farm Mwt. Auto. Ins. Co., 134 Idaho 302, 307, 1 P.3d 803, 808 (2000). The law in Idaho is consistent with the nearly universal principle that the purpose of UM coverage is met “by placing the insured in the same position as if the uninsured motorist had been insured, not a better position.” Matarese, 791 A.2d at 181; accord Vogelin v. Am. Family Mwt. Ins. Co., 346 Or. 490, 213 P.3d 1216, 1222 (2009); Theis v. Midwest Sec. Ins. Co., 232 Wis.2d 749, 606 N.W.2d 162, 167 (2000). Even in.a suit against an uninsured tortfeasor where the insurer has interpleaded to defend as the real party in interest, “it is the accident and the driver who caused it, rather than the insurer from which plaintiff now seeks a recovery ... that is in any way relevant to the issues to be decided.” Bardis v. First Trenton Ins. Co., 199 N.J. 265, 971 A.2d 1062, 1068 (2009). Since the insurer is only liable for what the tortfeasor would have to pay, it can contest damages and assert defenses such as comparative fault, provided it does so in good faith. See Walden v. Nationwide Ins. Co., 131 Idaho 18, 20, 951 P.2d 949, 951 (1998) (affirming summary judgment against the insured and holding that an insurance carrier could demand arbitration on a fairly debatable UM claim); see also Ellwein v. Hartford Accident & Indem. Co., 142 Wash.2d 766, 15 P.3d 640, 645-46 (2001) (citing cases from around the country stating that the UM insurer can assert good-faith defenses against the insured).
If UM claimants are to be in the same position they would be in if they were claiming directly against the tortfeasor, then the insurer is not obligated to pay medical bills as they arrive any more than the tortfeasor would be. The amount of damages that a tortfeasor would have to pay would only be determined by settlement, arbitration, or litigation. In all of these methods of claim resolution, a single agreement or judgment would be entered fixing damages. The settlement or judgment would not provide just for past undisputed medical bills, but also for less quantifiable damages such as pain and suffering or emotional distress, as well as for less certain damages such as future medical costs and lost wages. Some damages cannot be valued until all damages are known, such as pain and suffering, permanent injuries or disabilities, or lost limbs.
Holding that UM claimants should be treated the same as all first-party insureds *346 would also pencil new terms into every UM policy in the state. Again, there were no terms in the Weinsteins’ policy permitting them to collect multiple medical payments. Even though requiring piecemeal payment would certainly benefit the Weinsteins, this Court does not have the power to rewrite insurance contracts, even if the terms seem harsh. Lovey v. Regence BlueShield of Idaho, 139 Idaho 37, 41-42, 72 P.3d 877, 881-82 (2003). The UM provision stating that the Weinsteins could only receive what they would be “legally entitled to recover” has an established legal meaning and was therefore unambiguous.
Because the jury was improperly instructed that the Weinsteins were entitled to multiple payments under the terms of their insurance policy, and because the Weinsteins provided no evidence that Liberty Mutual failed to timely settle their claim, Liberty Mutual should have been granted a directed verdict or a judgment notwithstanding the verdict in its favor.
II. Liberty Mutual Did Not Act in Bad Faith In Handling the Weinsteins’ UM Claim
Liberty Mutual, relying on the advice of counsel, informed the Weinsteins that it would settle their entire UM claim rather than pay medical bills piecemeal. The Weinsteins refused to settle or to offer to settle the claim, and instead chose to sue for bad faith.[10]
Liberty Mutual’s behavior with regard to this claim was not bad faith as a matter of law for two intertwined reasons: (1) it was fairly legally debatable whether an insurer could require a UM claimant to settle a claim given the unclear law in Idaho, and (2) since Liberty Mutual relied on the advice of its lawyers regarding an issue long-settled in other jurisdictions, as pointed out in Part I above, Liberty Mutual did not delay settling the Weinsteins’ claim intentionally or negligently. Indeed, no “claim” was ever actually submitted under UM coverage. It was not a factual issue for the jury to decide whether the law was unsettled, but rather a legal issue for the court. By determining that a UM carrier could commit bad faith by refusing to make pre-settlement medical payments, the district court committed legal error.

1. It Was Fairly Legally Debatable Whether Liberty Mutual Had to Pay the Weinsteins’ Medical Bills Piecemeal

Regardless of whether Liberty Mutual breached the terms of the contract, the tort of insurance bad faith requires proof beyond mere breach. To prevail on a claim of bad faith, “the insured has the burden of showing that the claim was not fairly debatable.” Robinson v. State Farm Mut Auto. Ins. Co., 137 Idaho 173, 176, 45 P.3d 829, 832 (2002). “[W]hen a claim [of bad faith] involves a legal question of first impression, an insurer does not commit bad faith by litigating the claim even if the insurer does not prevail.” Vaught v. Dairyland Ins. Co., 131 Idaho 357, 362, 956 P.2d 674, 679 (1998). Liberty Mutual could have concluded in good faith that Idaho law would permit an insurer to settle a UM claim all at once.
Idaho law is far from clear that the UM carrier’s duty of good faith is coextensive with that of any other first-party carrier’s duties to its insureds. In White v. Unigard Mutual Insurance Co., this Court created a private cause of action for insurance bad faith against first-party insurance carriers. 112 Idaho 94, 98, 730 P.2d 1014, 1018 (1986). This Court expressly held in Unigard that the duty of good faith persists even if the insured files a lawsuit initiating an adverse *347 relationship with the insurer. Id. at 100, 730 P.2d at 1020. Nonetheless, this Court later acknowledged that conflicts of interest between insurers and claimants “will inherently exist in uninsured motorist claims.” Bantz v. Bongard, 124 Idaho 780, 785, 864 P.2d 618, 623 (1993). The Court has further suggested that a different duty of care applies to UM claims, even hinting that a bad-faith action might not be brought against a UM carrier at all. In a 1998 case, the Court stated that it was “[assuming, without deciding, that a bad faith action can arise from an uninsured motorist claim,” before holding that the UM carrier had not engaged in bad faith because of its incorrect but good-faith interpretation of unsettled law. Vaught, 131 Idaho at 362, 956 P.2d at 679. Similarly, in another post-Unigard case the Court stated: “[W]e need not decide the legal relationship which exists between an insured and an insurance carrier when the injured makes a claim under an uninsured motorist clause of an insurance policy, i.e., whether that relationship is adversarial or fiduciary.” Sullivan v. Allstate Ins. Co. (“Sullivan II ”), 117 Idaho 880, 882, 792 P.2d 905, 907 (1990) (emphasis added) (quoting Sullivan v. Allstate Ins. Co. (“Sullivan I”), 111 Idaho 304, 306, 723 P.2d 848, 850 (1986)). It has never been clear whether a UM claim must be handled the same as any other first-party insurance claim.
Given the sparse treatment that the duty of good faith has received in UM ease law, Liberty Mutual could reasonably have discerned from other jurisdictions’ decisions that it could resolve the UM claim at one time. Since Unigard, this Court has only upheld summary dismissal of bad-faith actions arising from UM or underinsured-motorist claims. E.g. Am. Foreign Ins. Co. v. Reichert, 140 Idaho 394, 403, 94 P.3d 699, 708 (2004); Anderson v. Farmers Ins. Co., 130 Idaho 755, 759, 947 P.2d 1003, 1007 (1997) overruled on other grounds by Martin v. State Farm Mut. Auto. Ins. Co., 138 Idaho 244, 61 P.3d 601 (2002) (upholding summary dismissal because it was fairly debatable whether the claimant was partially responsible for damages). This Court, however, has apparently never upheld a bad-faith action against a UM or under-insured-motorist carrier, let alone an action such as this where the insured, not the insurer, refused to negotiate a settlement. As explained above, a tremendous amount of authority from other jurisdictions indicates that a UM claimant is not entitled to payment until the extent of damages is known. According to these sources, the Weinsteins’ demand for payment was not just “fairly debatable,” but was not even a “claim” at all since there was no showing of the extent of damages, but only individual medical bills. Liberty Mutual reasonably relied on counsel’s advice in declining to pay individual medical bills to the Weinsteins.[11]
The Court’s opinion states that the Weinsteins’ claim was not fairly debatable because, under Inland Group of Companies, Inc. v. Providence Washington Insurance Co., 133 Idaho 249, 985 P.2d 674 (1999), the insurer cannot refuse to pay undisputed components of an insurance claim. This case, however, only involved an insurance company’s refusal to pay undisputed amounts in an offer to settle an ordinary claim under a first-party commercial-insurance policy, not a UM policy. Id. at 251-52, 985 P.2d at 676-77. Liberty Mutual would have to engage in significant inductive reasoning to conclude that Inland required ongoing medical payments here. First, Liberty Mutual would have to infer that it must make ongoing payments not just after, but also before making a settlement offer. Second, it would also have to surmise that the ongoing-payment requirement applies not just to first-party insurers like the one in Inland but also to UM carriers with a unique relationship to their insureds. Again, Liberty Mutual would have to reach this conclusion in the face of direct authority from Idaho suggesting that ordinary rules do not apply to bad-faith *348 claims under UM policies as well as contrary cases from across the country.

% Liberty Mutual Did Not Intentionally or Negligently Delay Settling in Bad Faith

In Unigard, this Court held that a party claiming extra-contractual damages for insurance bad faith must either prove that the insurer has “intentionally and unreasonably” denied or delayed payment, provided the other elements are met. 112 Idaho at 100, 730 P.2d at 1020. Two years later, this Court extended liability for insurance bad-faith to negligent delays or denials of insurance coverage. Reynolds v. Am. Hardware Mut. Ins. Co., 115 Idaho 362, 365, 766 P.2d 1243, 1246 (1988).
Similar to an ordinary first-party insurer, Liberty Mutual owes a duty of good faith to the Weinsteins even though a UM claim presents a “hybrid” set of duties to the insured. See Unigard, 112 Idaho at 100, 730 P.2d at 1020 (stating that insurers in a first-party insurance contract are in a fiduciary relationship with their insureds); Simper v. Farm Bureau Mut. Ins. Co., 132 Idaho 471, 474, 974 P.2d 1100, 1103 (1999) (same). UM insureds pay premiums to their insurers and should expect that many of the same features of good faith would apply. The insurer may not intentionally or unreasonably delay the final settlement process. Cf. Inland, 133 Idaho at 255, 985 P.2d at 680 (holding that an ordinary first-party insurer cannot delay claim settlement). It also “must go about the business of investigating and evaluating the claim,” when it learns of a possible claim so as to enable a settlement offer as soon as the claimant’s present and future expenses are sufficiently clear. Buzzard v. Farmers Ins. Co., 824 P.2d 1105, 1112 (Okla.1992). Similarly, the insurer should entertain reasonable offers from the insured to settle, even if the insurer has not yet gathered information sufficient to make an offer of its own. Cf. Inland, 133 Idaho at 255, 985 P.2d at 680 (“The duty to act in good faith exists at all times during the settlement process.”).
Nonetheless, prominent tort commentators warn that bad-faith actions can unfairly punish insurers where there is no culpable act by the insurer. Insurance companies, like people, often behave badly in ways that can seriously harm those with whom they do business. But punishment without evidence of culpability can undermine the purpose of bad-faith law. Bad-faith remedies are designed to protect consumers from intentional or reckless insurance practices. Victor E. Schwartz & Christopher E. Appel, CommonSense Construction of Unfair Claims Settlement Statutes: Restoring the Good Faith in Bad Faith, 58 Am. U. L. Rev. 1477, 1497 (2009). Refusing to demand a meaningful level of culpability provides “a windfall recovery to claimants” for the insurer’s honest mistakes by appealing to “the biases that juries maintain against insurers.” Id. at 1529. It encourages quick settlements at higher prices, causing insurers to pass extra-contractual damages on to consumers as higher premiums. Id. at 1528. In turn, higher premiums price more people out of the insurance market, worsening the very problem that UM coverage is intended to combat: the unexpected losses caused by uninsured or underinsured drivers on the road.
There is no evidence that Liberty Mutual intentionally sought to starve out the Weinsteins by delaying a settlement in bad faith or otherwise acted in an objectively unreasonable manner. Instead, the only potentially culpable act that Liberty Mutual committed was relying on the advice of its lawyers. As explained above, however, even the general parameters of a UM insurer’s duty of good faith has not been clarified by this Court, while the law elsewhere is largely settled that pre-settlement payments are unnecessary. The Weinsteins’ attorney never provided legal authority to Liberty Mutual as it requested to explain why it could not require the Weinsteins to settle, and indeed he could not have done so. Liberty Mutual therefore simply relied in good faith on its attorney’s interpretation of Idaho law and insisted on settling the claim in total rather than paying piecemeal benefits.
Liberty Mutual committed some bureaucratic bungling by delaying the Weinsteins’ MedPay claims based on an incorrect interpretation of its coordination-of-benefits provi *349 sion. This, in turn, temporarily barred the Weinsteins from recovering under their UM policy because such recovery was only available if the MedPay benefits were exhausted. Nonetheless, the jury found no bad faith in how Liberty Mutual handled the MedPay claim. Moreover, Liberty Mutual’s policy of settling UM claims all at once, and the Weinsteins’ refusal to comply with that policy, would have resulted in the same delay because it was unclear what further treatment Sarah would require for her injuries. Liberty Mutual informed the Weinsteins that they could make a settlement offer, but the Weinsteins never did so. The Weinsteins apparently did not want to settle at least in part because it appeared that Sarah would need ongoing medical treatment.
Liberty Mutual did send a pre-settlement advance of $10,000 to the Weinsteins along with an agreement stating: (1) that the payment did not mean Liberty Mutual waived any of its rights or defenses to the claim; and (2) the agreement was not a concession of the tortfeasor’s liability. Such an offer does not constitute bad faith. Again, Liberty Mutual, relying on the informed opinion of its attorney, believed in good faith that such an offer was not necessary in the first place, and was merely extending the offer to make peace. Neither of these terms is unreasonable either. First, as previously mentioned, the insurer may, so long as it acts in good faith, assert any defenses to payment that the tortfeasor could have asserted. See Vaught, 131 Idaho at 362, 956 P.2d at 679 (stating that an insurer does not commit bad faith in challenging a fairly debatable claim). Liberty was not attempting to reserve any rights it did not already have. Second, Liberty Mutual had already conceded the tortfeasor’s liability. At worst, Liberty Mutual was simply refusing to concede the extent of the tortfeasor’s liability by making the settlement-advance offer; it was not attempting to deny the tortfeasor’s fault in colliding with the Weinsteins’ vehicle. Whether or not Liberty Mutual regarded its settlement advance as admitting the tortfeasor’s “liability” was therefore immaterial.
Liberty Mutual relied on the advice of its attorneys in waiting to settle the Weinsteins’ entire UM claim. Given the ambiguous state of Idaho law at the time and the overwhelming authority from other jurisdictions that supported its actions, Liberty Mutual’s decision to rely on this advice was reasonable. Accordingly, it did not act in bad faith as a matter of law and was entitled to a directed verdict or a judgment notwithstanding the verdict.
III. The Punitive Damages as Remitted Are Unconstitutional
Preliminarily, the Court’s Opinion applies an incorrect standard of review. The Opinion correctly states that this Court must uphold the jury’s findings of fact, provided they are supported by substantial and competent evidence. Idaho Power Co. v. Idaho State Tax Comm’n, 141 Idaho 316, 321, 109 P.3d 170, 175 (2005). But because “the level of punitive damages is not really a ‘fact’ ‘tried’ by a jury,” this Court freely reviews the punitive-damages award to ensure that it comports with due process. Cooper Indus. v. Leatherman Tool Group, Inc., 532 U.S. 424, 437, 121 S.Ct. 1678, 1686, 149 L.Ed.2d 674, 687-88 (2001) (quotation omitted). The Court’s opinion instead determines that the jury acted reasonably in determining a number of facts unfavorable to Liberty Mutual, but does not engage in an independent constitutional analysis to determine if the facts found by the jury could, as a matter of law, support such an unusually high punitive-damages award. For example, the Court’s opinion states that the jury “could reasonably have found” that Liberty Mutual intended to starve the Weinsteins out and that Liberty Mutual recklessly caused the Weinsteins’ emotional distress. This, however, is only half of the analysis. The Idaho Supreme Court exercises free review over constitutional issues. Plummer v. City of Fruitland, 139 Idaho 810, 812, 87 P.3d 297, 299 (2004). It is the task of this Court to determine if the award in this case comports with the Due Process Clause in light of the recent U.S. Supreme Court cases restricting punitive damages, not merely whether the jury could have found facts that reflect negatively on Liberty Mutual. *350 Regarding the substance of the award, “[i]t is well settled that punitive damages are not favored in the law and should be awarded only in the most unusual and compelling circumstances, and are to be awarded cautiously and within narrow limits.” New Villager Condo. Ass'n v. Idaho Power Co., 129 Idaho 551, 554, 928 P.2d 901, 904 (1996) (quoting Manning v. Twin Falls Clinic Hosp., 122 Idaho 47, 52, 830 P.2d 1185, 1190 (1992)). There is no mathematical formula for determining the constitutionality of a punitive-damages award, but the U.S. Supreme Court has identified three factors to guide the analysis: (1) the reprehensibility of the conduct; (2) the relationship between the penalty and the actual or potential harm; and (3) other sanctions imposed or available for similar conduct. Myers v. Workmen’s Auto. Ins. Co., 140 Idaho 495, 509, 95 P.3d 977, 991 (2004).
Even if Liberty Mutual’s actions can be considered tortious bad faith, its erroneous reading of Idaho law is at worst an act of negligence. Thus, none of these factors favor upholding the award in this case even as remitted. The Weinsteins are not entitled to punitive damages, and even if they are, the award should be limited to a 4:1 ratio.

1. The Reprehensibility of Liberty Mutual’s Conduct Does Not Justify Any Punitive Damages

Because punitive damages are designed to punish and deter, the Due Process Clause requires that the defendant’s conduct be sufficiently reprehensible. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419, 123 S.Ct. 1513, 1521, 155 L.Ed.2d 585, 602 (2003). To determine if the plaintiff has overcome this burden, the U.S. Supreme Court has directed the courts to consider whether:
the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

Id.

First, it is true that the Weinsteins were financially vulnerable. They warned Liberty Mutual that they needed cash to pay past-due medical bills. There is also evidence that they suffered some mental anguish over their precarious financial situation. The Weinsteins experienced familial strife and Mrs. Weinstein in particular cried and was embarrassed at a doctor’s office. The family suffered anxiety over whether Sarah would be able to receive the medical treatment she needed especially because Liberty Mutual indicated to their creditors that the Weinsteins’ MedPay benefits had been exhausted, which, by the way, was a true statement.
Nonetheless, the Weinsteins suffered primarily economic damage, and there is no reason why this harm was not fully redressable by bad-faith compensatory damages. “It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant’s culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.” Id.
More importantly, the Weinsteins do not attempt to explain why the bad-faith award does not redress their mental anguish. In Campbell, the claimants suffered similar mental distress at the hands of their insurer, but the Court determined that they had been made whole, noting that “compensatory damages ... already contain this punitive effect.” 538 U.S. at 426, 123 S.Ct. at 1525, 155 L.Ed.2d at 606. The Weinsteins received $210,000 in compensation for their bad-faith claim. As the Weinsteins themselves vigorously argued in their briefs, the bad-faith damages are meant to compensate them for whatever mental hardship they endured. Walston v. Monu. Life Ins. Co., 129 Idaho 211, 218, 923 P.2d 456, 463 (1996). There is no further reason to assess punitive damages.
Second, Liberty Mutual has not repeatedly engaged in unlawful practices. “Certainly, evidence that a defendant has repeatedly en *351 gaged in prohibited conduct while knowing or suspecting that it was unlawful” would indicate a higher degree of reprehensibility. BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 576-77, 116 S.Ct. 1589, 1599, 134 L.Ed.2d 809, 826-28 (1996). In Gore, for example, the jury awarded punitive damages for fraud because BMW did not inform the plaintiff that his new car had been repainted even though BMW’s disclosure policy complied with the strictest applicable state regulations. Id. at 578, 116 S.Ct. at 1600, 134 L.Ed.2d at 828. The U.S. Supreme Court found that BMW’s disclosure policy showed no evidence of reprehensibility. Id. at 579, 116 S.Ct. at 1601, 134 L.Ed.2d at 828-29. Similarly, there is no indication that Liberty Mutual “persisted in a course of conduct after it had been adjudged unlawful on even one occasion, let alone repeated occasions.” Id. The Weinsteins can provide no direct legal authority from anywhere requiring a UM carrier to pay medical bills piecemeal rather than simply settle the entire claim in good faith. Liberty Mutual’s settlement policy is apparently in place because its attorneys believed that, under the law in Idaho and elsewhere, a bad-faith claim does not accrue until the claimant can prove the extent of damages. This undercuts a finding that Liberty Mutual acted reprehensibly.
Third, there is no allegation of intentional fraud, malice or other invidious activity. Cf. Walston, 129 Idaho at 221-22, 923 P.2d at 466-67 (upholding punitive damages against an insurance company for widespread deceptive marketing); Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020, 1043 (9th Cir.2003) (noting that racial discrimination is particularly reprehensible). Nor was there any intentional infliction of harm. See Highland Enter. v. Barker, 133 Idaho 330, 348, 986 P.2d 996, 1014 (upholding modest punitive damages for defendants’ intentional efforts to damage plaintiffs’ construction equipment). Again, this is not an ordinary wrongful denial of benefits case where Liberty Mutual defied well-established rules of insurance law. Liberty Mutual’s reliance on its attorneys’ advice was at worst negligent, not malicious. Liberty Mutual’s agents knew that Liberty Mutual’s settlement policy might create anxiety for the Weinsteins and jeopardize their credit, but this was certainly not the goal of Liberty Mutual’s actions. The notes and letters from Liberty Mutual’s agents do not evince any intent to “starve” the Weinsteins out or to exploit their financial weakness. Liberty Mutual indicated to the Weinsteins that they could settle their claim early and obtain the compensation they needed. As the insurer, Liberty Mutual would have been obligated to negotiate such a settlement in good faith. Inland Group of Cos. v. Providence Wa. Ins. Co., 133 Idaho 249, 255, 985 P.2d 674, 680 (1999). The conduct at issue here, even if damaging, was simply not so reprehensible as to justify any punitive damages at all, let alone such a peculiarly high ratio of damages.

2. Even If Punitive Damages Were Allowed, the Ratio of Punitive Damages to Compensatory Damages Should Not Exceed D1

The jury awarded $210,000 in compensatory damages for bad faith and $6 million in punitive damages, an award with a 28.5:1 ratio of punitive to compensatory damages. The district court remitted the award to $1.85 million, or a 9:1 ratio.
The U.S. Supreme Court has stated that “in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.” Campbell, 538 U.S. at 425,123 S.Ct. at 1524,155 L.Ed.2d at 605-06. The Court, however, has noted that punitive statutes dating back hundreds of years did not exceed a 4:1 ratio, and has further instructed that “an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety.” Id. The median punitive-damages award in the United States is below even a 1:1 ratio. Exxon Shipping Co. v. Baker, 554 U.S. 471,-& n. 14, 128 S.Ct. 2605, 2624 & n. 14,171 L.Ed.2d 570, 589 & n. 14 (2008) (citing Eisenberg et al., Juries Judges, and Punitive Damages: Empirical Analyses Using the Civil Justice Survey of State Courts 1992, 1996, and 2001 Data, 3 J. Empirical L. Stud. 263, 271 (2006)). The Due Process Clause demands consistency and predictability in this area. “Elementary *352 notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty.” Gore, 517 U.S. at 574,116 S.Ct. at 1598, 134 L.Ed.2d at 826. Since the majority of punitive-damages eases result in awards a small fraction of even the remitted award in this case, it follows that exceptional circumstances must justify the award if it is to exceed a 4:1 ratio. Exceptional circumstances are absent here.
“[Hjeavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect ... or when the value of injury and the corresponding compensatory award are small (providing low incentives to sue).” Exxon, 554 U.S. at-, 128 S.Ct. at 2622, 171 L.Ed.2d at 587. In Hall v. Farmers Alliance Mutual Insurance Co., a homeowner’s insurance company unjustifiably delayed paying a first-party claim for over two years and was found liable by a jury for bad faith. 145 Idaho 313, 317, 179 P.3d 276, 280 (2008). This Court upheld the district court’s decision to remit the award down to a 4:1 ratio, reasoning that the insurance company’s delay “does not involve a situation in which the injury was difficult to detect or the value of noneconomic harm was difficult to determine.” Id. at 323, 179 P.3d at 286. It is difficult to articulate a reason why Liberty Mutual should be treated differently from the defendant in Hall. The compensatory damages in that case were about $19,000, roughly 10% of the $210,000 the Weinsteins received, indicating that the Weinsteins had plenty of incentive to sue. Id. at 317, 179 P.3d at 280. Liberty Mutual did not attempt to hide anything — it was, in fact, quite clear that it would only settle the Weinsteins’ claim, not pay piecemeal. A 4:1 ratio would therefore be the constitutional limit of the Weinsteins’ recovery.
Compare the ratio in this ease with others where defendants received lighter punishments for more culpable conduct. In one Ninth Circuit case, a large employer paid a 6:5 ratio for consciously permitting a pervasive atmosphere of ethnic discrimination in the workplace and for wrongful discharge. Pavon v. Swift Transp. Co., 192 F.3d 902, 910 (9th Cir.1999). In another case, the court reduced from 10:1 to 3:1 a punitive-damages award against a state regulator who abused his office to tortiously interfere with the plaintiffs business. S. Union Co. v. Irvin, 563 F.3d 788, 792 (9th Cir.2009).
The Court’s opinion does not directly address the exceptionally high damages ratio remitted by the district court. Instead, it dismisses Liberty Mutual’s request for a 1:1 ratio and seems to suggest that Liberty Mutual has somehow waived the argument that the ratio should be reduced to some other value, such as 4:1. Of course, an appellant waives an issue if it is not supported by authority or argument on appeal, Gem State Ins. Co. v. Hutchison, 145 Idaho 10, 16, 175 P.3d 172, 178 (2007), but Liberty Mutual dedicated several pages of its opening brief to the specific issue of an appropriate punitive-damages ratio. It put the Weinsteins on notice of a constitutional challenge to the remitted award by arguing that the reprehensibility of Liberty Mutual’s conduct and the availability of other sanctions did not support such a high ratio. Liberty Mutual should not be penalized for not “choosing a correct ratio among the infinite number of ratios theoretically available” in its brief. Southern Union, 563 F.3d at 791. Requiring the appellant to name a ratio, or a specific damages amount for that matter, would take to a logical extreme the requirement that issues must be properly preserved on appeal.

S. Other Sanctions

“[A] reviewing court engaged in determining whether an award of punitive damages is excessive should ‘accord substantial deference’ to legislative judgments concerning appropriate sanctions for the conduct at issue.” Gore, 517 U.S. at 583, 116 S.Ct. at 1603, 134 L.Ed.2d at 831 (quoting Browning-Ferris Indus. of Vermont v. Kelco Disposal, Inc., 492 U.S. 257, 301, 109 S.Ct. 2909, 2934, 106 L.Ed.2d 219, 254 (1989) (O’Connor, J., concurring in part)). In Gore, the Court noted that the maximum fine in any state for the defendant’s misconduct was $10,000, an amount too small to put the defendant on notice that it might suffer a $2 million punitive-damages award. Id. at 584, 116 S.Ct. at *353 1603, 134 L.Ed.2d at 831-32. Similarly, the maximum fine under the Idaho Unfair Claim Settlement Practices Act is $10,000. I.C. § 41-1329A. Just as was the case in Gore, such a small penalty could not have put Liberty Mutual on notice of a possible $1.85 million judgment.
Because Liberty Mutual’s conduct was not sufficiently reprehensible, no punitive damages should have been awarded. Even if punitive damages were appropriate, a 4:1 ratio should have been the maximum, given that no aggravating circumstances were at play here to justify a ratio outside of the mainstream of punitive-damages cases.
Conclusion
I would reverse the judgment in favor of the Weinsteins. The district court erroneously instructed the jury that it could find a breach of contract and insurance bad faith simply because Liberty Mutual refused to pay portions of an otherwise fairly debatable UM claim. These instructions incorrectly applied fairly debatable law in the State of Idaho. Similarly, the punitive-damages award in this case violates the Due Process Clause because it punishes Liberty Mutual for its reasonable interpretation of ambiguous state law. I would therefore also reverse the punitive damages award against Liberty Mutual or, in the alternative, remit the award to a 4:1 ratio.

. The Court in Brinkman determined that the cause of action on an underinsured-motorist policy accrues for the purposes of accumulating prejudgment interest at the moment of the accident or when a proof of loss is submitted if one is needed. 115 Idaho at 353, 766 P.2d at 1234. This point of law would have supported the Weinsteins’ position if it were not later overruled; the rule now is that the cause of action accrues when payments are due under the terms of the policy. Greenough v. Farm Bureau Mut. Ins. Co., 142 Idaho 589, 593, 130 P.3d 1127, 1131 (2006).

. Accord. Singer v. State Farm Mut. Auto. Ins. Co., 116 F.3d 373, 378 (9th Cir.1997) (applying California law); Harvey v. Mitchell, 522 So.2d 771, 773 (Ala.1988); Borjas v. State Farm Mut. Auto. Ins. Co., 33 P.3d 1265, 1269 (Colo.Ct.App.2001); Cincinnati Ins. Co. v. Trosky, 918 N.E.2d 1, 9 (Ind.Ct.App.2009); Winner v. Ratzlaff, 211 Kan. 59, 505 P.2d 606, 610 (1973); U.S. Fid. & Guar. Co. v. Preston, 26 S.W.3d 145, 148 (Ky.2000); Booth v. Fireman’s Fund Ins. Co., 253 La. 521, 529, 218 So.2d 580, 583 (1969); W. Am. Ins. Co. v. Popa, 352 Md. 455, 723 A.2d 1, 7 (1998); Oates v. Safeco Ins. Co., 583 S.W.2d 713, 715 (Mo. 1979); Swift v. Dairyland Ins. Co., 250 Neb. 31, 547 N.W.2d 147, 151 (1996); Boradiansky v. State Farm Mut. Auto. Ins. Co., 141 N.M. 387, 156 P.3d 25, 30 (2007); Karlson v. City of Oklahoma City, 711 P.2d 72, 74-75 (Okla.1985); Vega v. Farmers Ins. Co., 134 Or.App. 372, 895 P.2d 337, 342 (1995); Brainard v. Trinity Univ. Ins. Co., 216 S.W.3d 809, 815 (Tex.2007).
Put another way, this language means that the claimant has to be able to prove "that the other driver cannot pay some or all of what the insured driver would be entitled to receive under tort.” Mark J. Browne, Ellen S. Pryor & Bob Puelz, The Effect of Bad-Faith Laws on First-Party Insurance Claims Decisions, 33 J. Legal Stud. 355, 365 (2004).

. Sometimes courts lump together discussions of UM policies with discussions of underinsuredmotorist policies, calling them both “u-claims” because the two types of coverage share many similarities.

. At trial, Liberty Mutual argued to the jury that the law was unsettled in Idaho as to whether a UM carrier was required to pay pre-settlement medical bills, in effect asking the jury to interpret the condition of state law. It requested the court to instruct the jury that "[wjhen a claim involves a legal question of first impression, an insurer does not commit bad faith by litigating the claim even if the insurer does not prevail.” The court erroneously declined to give this instruction. The Weinsteins contended at trial that other district courts in Idaho had issued rulings requiring UM carriers to pay medical bills before settlement. In response, Liberty Mutual requested a jury instruction stating that district-court rulings were not binding law across the state. This instruction was also erroneously denied.

. In some jurisdictions, the insurance company "owes no fiduciary duty to its insured in a claim arising under an uninsured motorist provision. ... The respective interests of insurer and insured in such an action are adverse." Lauzon v. State Farm Mut. Auto. Ins. Co., 164 Vt. 620, 674 A.2d 1246, 1248 (1995). Thus, a significant minority of states do not permit any tort recovery for bad faith against a u-claim carrier. E.g. Lawton v. Great Sw. Fire Ins. Co., 118 N.H. 607, 392 A.2d 576, 581 (1978); Beck v. Farmers Ins. Exch., 701 P.2d 795, 798 (Utah 1985).